Anthony D. Prince (SBN # 202892)
General Counsel, California Homeless Union
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100,
Berkeley CA, 94705
Ph. 510-301-1472
Email: princelawoffices@yahoo.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERKELEY HOMELESS UNION<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF BERKELEY, THOMAS GREGORY, PAUL BUDDENHAGEN, PETER RADU, OKEYA VANCE, DOES 1-10<br><br>Defendant. | Case No.:<br><br>**VERIFIED COMPLAINT AND *EX-PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO HALT THE CLEARING OF THE OHLONE PARK ENCAMPMENT AND EVICTION OF EVICTION OF BERKELEY HOMELESS UNION MEMBERS AND OTHER HOMELESS CAMPERS.**<br><br>**FOR VIOLATIONS 42 USC § 1983 AND AMERICANS WITH DISABILITIES ACT**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT AND APPLICATION FOR TRO AND PI - 1

# Table of Contents

*Introduction*.............................................................................................................. *3*

*Jurisdiction and Venue*............................................................................................ *4*

*The Parties*................................................................................................................ *4*

*Berkeley Homeless Union Has Standing To Seek Injunctive Relief On Behalf Of Its Members* ..................................................................................................................... *6*

*City Has Been Timely Notified Of This Complaint and Application For TRO*..................... *8*

*Statement of Facts*.................................................................................................... *9*

*Standard of Review For Temporary Restraining Order*.......................................... *22*

*Serious Questions Going To The Merits*.................................................................. *22*

**FIRST CAUSE OF ACTION - 42 U.S.C. § 1983 14th Amendment State-Created Danger Doctrine** ....................................................................................................................22

**SECOND CAUSE OF ACTION – 42 U.S.C. § 12131 , Title II of the Americans With Disability Act**..............................................................................................................30

**THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 Fourth Amendment Unreasonable Search and Seizure** ..............................................................................................................33

*Irreparable Harm*................................................................................................... *35*

*Balance of Equities and Public Interest*................................................................. *39*

*PRAYER FOR RELIEF* ................................................................................ *41*

*VERIFICATION* .........................................................................................*42*

## Introduction

1.      Tomorrow morning, May 27, 2025, the City of Berkeley will forcibly displace approximately 40 unhoused individuals—members of the Berkeley Homeless Union ("BHU")—from Ohlone Park.  **(Decl Willis ¶11 Ex A.)**  Ohlone Park is the only location in central Berkeley that provides reliable access to public bathrooms, potable water, and proximity to essential services like meals, medical support, and mutual aid. The City's planned eviction is not just an administrative act—it is a dangerous and irresponsible disruption of life-sustaining conditions that threatens grave harm and constitutional injury to BHU members.

2.      This Verified Complaint and Motion for Temporary Restraining Order (TRO) and Preliminary Injunction seeks to immediately halt the City of Berkeley's forced eviction and destruction of property at Ohlone Park. The City's actions—taken without adequate ADA accommodations, without viable alternative shelter, and without regard for the physical safety of disabled residents—will expose people to dehydration, infection, violence, and death.

3.      Declarants from BHU members living at Ohlone Park and expert medical testimony from Registered Nurse Megan Brizzolara confirms that displacement from Ohlone Park will foreseeably result in serious injury and premature death due to exposure, dehydration, untreated infections, violence, isolation, and disruption of medically necessary survival routines. Encampment sweeps like the one planned tomorrow are not neutral acts—they are medically dangerous. They deprive disabled and immunocompromised people of basic public health infrastructure and are especially harmful to women and other vulnerable populations.

COMPLAINT AND APPLICATION FOR TRO AND PI - 3

4.    The Court should intervene by issuing a TRO to halt the planned eviction at Ohlone Park. Plaintiffs respectfully request an immediate TRO enjoining the City of Berkeley from carrying out the May 28th eviction and associated enforcement actions. The evidence shows that this eviction, if allowed to proceed, will irreparably harm some of the most vulnerable residents of Berkeley, in violation of the U.S. Constitution and the Americans with Disabilities Act.

## Jurisdiction and Venue

5.  This court has original jurisdiction under 42 USC 1983 for violation of the Fourteenth Amendment State Created Danger Doctrine. Additionally, this court has original jurisdiction under Title II of the Americans With Disability Act.

## The Parties

6.    **Berkeley Homeless Union** is an unincorporated membership organization advocating for the rights of unhoused individuals in Berkeley, including disabled individuals who have been denied reasonable accommodations. BHU provides direct support, organizes community defense efforts, and advocates for policy changes to protect unhoused individuals from displacement and discrimination.

**Mailing Address:** 1349 Hearst Avenue Berkeley, CA 94702

Email: berkeley.homeless.union@gmail.com

Counsel of Record:

Anthony D. Prince (SBN # 202892)
General Counsel, California Homeless Union
Law Offices of Anthony D. Prince
2425 Prince Street, Ste. 100,
Berkeley CA, 94705

COMPLAINT AND APPLICATION FOR TRO AND PI - 4

Ph. 510-301-1472
Email: princelawoffices@yahoo.com

Defendant **CITY OF BERKELEY** is a municipal corporation organized under the laws of the State of California.

Mailing Address: 2180 Milvia St, Berkeley, CA 94704

Counsel of Record:

Marc Aaron Shapp
*City Of Berkeley*
510-981-6998
mshapp@berkeleyca.gov

Defendant **PAUL BUDDENHAGEN** is the City Manager of the City of Berkeley who perpetrates a policy of evicting unhoused disabled Plaintiffs without observing the City of Berkeley's own ADA policies. He is sued in his official capacity.

Mailing Address: 2180 Milvia St, Berkeley, CA 94704

Email: pbuddenhagen@berkeleyca.gov

Defendant **THOMAS GREGORY**, as the City's ADA Program Coordinator, has repeatedly denied reasonable accommodation requests without proposing alternatives, in direct violation of 28 C.F.R. § 35.130(b)(7). He is sued in his official capacity.

Mailing Address: 2180 Milvia St, Berkeley, CA 94704

Email: tgregory@berkeleyca.gov

Defendant **PETER RADU** in his official capacity as **Assistant to the City Manager for Neighborhood Services**, has played a key role in enforcing abatement policies that disproportionately impact disabled, unhoused individuals. He has dismissed legitimate disability accommodation requests, failed to ensure compliance with the Americans with Disabilities Act

COMPLAINT AND APPLICATION FOR TRO AND PI - 5

(ADA), and made inflammatory comments questioning the legitimacy of individuals' disabilities. Despite being in a leadership position, he has refused to engage in good-faith discussions with affected camp residents, instead prioritizing punitive enforcement over solutions that would protect disabled individuals from harm. He is sued in his official capacity.

Mailing Address: 2180 Milvia St, Berkeley, CA 94704

Email: pradu@berkeleyca.gov

7. Defendant **OKEYA VANCE** is the field supervisor of the Berkeley Homeless Response Team. In her official capacity as a member of the Homeless Response Team (HRT), has demonstrated a pattern of hostility and neglect toward disabled residents at the encampment. She has repeatedly refused to provide necessary assistance to individuals with mobility impairments, cognitive disabilities, and other medical conditions. Her dismissive attitude and refusal to accommodate residents' disability-related needs have created additional barriers for those already facing extreme hardship. She is sued in her official capacity.

8.    **DEFENDANTS DOES 1-10** are public and private parties who are currently unknown to Plaintiff but will be added in by amendment of the complaint.

## Berkeley Homeless Union Has Standing To Seek Injunctive Relief On Behalf Of Its Members

9. "The doctrine of associational standing permits an organization to 'sue to redress its members' injuries, even without a showing of injury to the association itself.'" Or. Advocacy Ctr. v. Mink, 332 F.3d 1101, 1109 (9th Cir. 2003) (quoting *United Food & Comm. Workers Union Loc. 751 v. Brown Group, Inc*., 517 U.S. 544, 552 (1996)). An association has standing to sue on behalf of its members when: "(1) its members would otherwise have standing to sue in

COMPLAINT AND APPLICATION FOR TRO AND PI - 6

their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The third prong is a "judicially fashioned and prudentially imposed" question, as opposed to a constitutional requirement of standing. *Mink*, 322 F.3d at 1113 (citing *United Food & Comm. Workers Union Loc. 751*, 517 U.S. at 557 ("[T]he third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution.").

10. The Berkeley Homeless Union has standing to sue for injunctive relief on behalf of all its members that face displacement tomorrow by the City of Berkeley.

11. First, as described in attached declarations – Berkeley Homeless Union members face state created danger and discrimination based on their disabilities. **See Decl Prado, Weaver ¶2, Wootan ¶2, Gates ¶2, Willis ¶2, Taylor ¶2.**

12. Second, advocacy organizing for the civil rights of homeless people is the whole goal of the Union – with Union Officers who are themselves unhoused engaged in direct advocacy and aid to people experiencing homelessness. **Decl Prado.**

13. Third, as a prudential question courts typically find that membership based organizations for injunctive relief promote judicial efficiency – as opposed to claims for damages. *See Boyd v City of San Rafael* 3:23-cv-04085-EMC (Granting PI for around 40 San Rafael Homeless Union members) "As to the third prong, this is a prudential consideration "designed to promote efficiency in adjudication." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 951 n.9 (9th Cir. 2002). Here, allowing the Union to assert claims on behalf of its members promotes judicial efficiency by

COMPLAINT AND APPLICATION FOR TRO AND PI - 7

avoiding multiple, individual lawsuits being filed on behalf of each resident of the encampment. Further, the nature of the claims asserted do not counsel against associational standing. *See Laborers Int'l Union Loc. 261 v. City & Cnty. of San Francisco*, 2022 WL 2528602, at *6 (N.D. Cal. July 6, 2022) (explaining that unlike claims seeking damages which requires individualized proof, claims seeking injunctive relief are well-suited for adjudication by organizational plaintiff) (citing *Comm. for Immigrant Rts. of Sonoma Cnty. v. Cnty. of Sonoma*, 644 F. Supp. 2d 1177, 1194 (N.D. Cal. 2009)). Thus, the Court sees no need to find that the organization lacks standing as a matter of prudence. The Union has established organizational standing."

## City Has Been Timely Notified Of This Complaint and Application For TRO

14. Defendant City of Berkeley has been on notice of this motion for a Temporary Restraining Order and Preliminary Injunction since May 21, 2025. See Prince Decl. ¶¶1–9. In fact, two substantively identical motions for TRO were filed in *Berkeley Homeless Union v. City of Berkeley*, Case No. 3:25-cv-01414-EMC, on May 21 and May 23, 2025, seeking to enjoin the clearing of BHU members from Ohlone Park. The May 21 motion was denied on procedural grounds. See Prince Decl. ¶2. The May 23 motion was likewise denied on procedural grounds, with Judge Chen directing BHU to file a new lawsuit because the Ohlone Park claims were too factually distinct from those in the original action. *Id* Accordingly, Defendants have had ample notice of Plaintiffs' intent to seek emergency relief.

15. In addition, BHU has offered to cooperate with the City to address its public health and safety concerns at the encampment and to informally resolve the dispute. See Prince Decl. ¶7. BHU also requested, at minimum, a delay in enforcement to allow time for a briefing schedule

COMPLAINT AND APPLICATION FOR TRO AND PI - 8

on the TRO and PI. See Prince Decl. ¶6. The City rejected all of these proposals without offering any alternatives. See Prince Decl. ¶8. As a result, Plaintiffs have no choice but to bring this action to prevent the impending eviction scheduled for tomorrow.

## Statement of Facts

16. The City of Berkeley ("City") has recently intensified its policy and practice of forcibly displacing communities of unhoused people. Following the closure of encampments, the City subsequently uses hardscaping, fencing, and signage to permanently enjoin unhoused people from returning under the City's Resolution No. 71,513-N. This strategy has been used at centrally located public spaces such as Civic Center Park, Old Berkeley City Hall and People's Park, as well as on other large encampment areas such as 4th and Bancroft Streets and 2nd and Cedar Street and Eighth and Harrison.

17. This escalating campaign of eviction and exclusion has left unhoused residents with fewer and fewer options for safe and stable shelter — creating a perilous game of displacement. "Where the essentials to survival are potentially scarce, the unhoused cannot simply be relegated to a game of musical chairs." *Boyd v City of San Rafael* 3:23-cv-04085-EMC N.D. Oct. 19.

18. On September 24, 2024, the Berkeley City Council—along with Mayor Arreguín—unanimously passed a new encampment policy that authorizes the city of Berkeley to close encampments under specific criteria. While the City's resolution claims to uphold the *Martin v. Boise* (2018) decision, which prohibits anti-camping enforcement when adequate shelter is unavailable, the City simultaneously amended Chapter 14.48 of the Berkeley Municipal Code (*Miscellaneous Use of Streets and Sidewalks*) to include six new exceptions. These

COMPLAINT AND APPLICATION FOR TRO AND PI - 9

exceptions grant the City expanded authority to forcibly remove encampments even in the absence of shelter.

19.    On  May 14, 2025 the City of Berkeley posted a notice of abatement against Berkeley Homeless Union members living at Ohlone Park. **Decl Willis** ¶11 Ex A**.** Ohlone Park composes 9.8 acres and is the largest park in central Berkeley. It also the only park that has accessible public bathrooms and water fountains, that is also proximate to critical services like Dorothy Day House.

20.    Plaintiffs are disabled individuals and members of the Berkeley Homeless Union. Like many BHU members—both disabled and non-disabled—they rely on their tents, vehicles and encampment setups as their only available form of shelter, safety, community and essential accommodations. These arrangements are not a matter of preference, but of necessity, given the lack of affordable, non-congregate, and disability-accommodating housing options in the City of Berkeley.

21.    Forcibly removing these structures and vehicles will likely lead to the rapid deterioration of their physical and mental health. Regardless of seasonal weather shifts, individuals need shelter to protect their personal health and safety every day. Without it, they will be exposed to harmful conditions such as prolonged cold, sun, wind, dampness, and poor air quality from the daily flow of traffic — all of which pose serious risk of injury, hospitalization and even death.

22.    If individuals are forcibly removed from their dwellings, they will be exposed to environmental hazards such as unsanitary ground conditions, vermin, mold, and toxic runoff, which further jeopardize immune-compromised residents. Exposure to outdoor elements also

COMPLAINT AND APPLICATION FOR TRO AND PI - 10

increases the likelihood of infections, untreated wounds, respiratory complications and hypothermia. This will result in injury, illness, and premature mortality of BHU members.

23.     Psychological threats are equally severe for every individual: chronic sleep deprivation, sensory overstimulation, and the persistent stress of insecurity worsen mental health conditions like PTSD, schizophrenia, anxiety and depression. Together, these environmental and psychological stressors create an ongoing and life-threatening danger to health, safety and survival. The loss of shelter is not merely disruptive — it can be fatal.

24.     Public records obtained by the BHU show that as of April 7, 2025, the City of Berkeley had only 350 shelter beds available citywide, and just 150 of those beds were classified ADA-accessible. On that date, only eight shelter beds were available for move-in, none of which were ADA compliant. Around May 2, Dorothy Day House's emergency shelter beds were permanently closed for the winter season. More recent data from May 5, confirms that only three beds are now available at Harrison House, with zero ADA-accessible options.

25.     This means that the City is enforcing displacement and abatement policies while failing to provide even minimally sufficient or accessible shelter alternatives. This leaves unhoused residents—including those with disabilities—without a lawful, safe, or accessible place to go, in direct violation of the ADA, constitutional protections against cruel and unusual punishment, and due process requirements.

26.     While relocation is difficult for all residents, it poses especially severe challenges for individuals with physical or mental disabilities. Many disabled residents cannot pack their belongings or transport their possessions without direct assistance. As a result, they are at high risk of losing critical items such as medications, identification, and mobility aids, which are often irrecoverable as the City does not consistently store unhoused people's property.

COMPLAINT AND APPLICATION FOR TRO AND PI - 11

27.     According to an October 2023 presentation of Peter Radu, Assistant to the City Manager, the Homeless Response Team ("HRT") has only stored belongings on 34 occasions since the inception of the team in 2021. **(Document 1, Page 34)** In that same period of time, the HRT conducted 369 encampment closures and 444 deep cleanings. **(Document 1, Page 30.)**

28.     However, public records indicate that the actual number of storage events is even lower than what was presented to the City Council. The Department of Public Works documented only 21 instances in which it stored the property of unhoused individuals during the same period referenced in the City's presentation. Since that presentation in October 2023, the pattern has persisted — with only eight additional storage events documented through March 27, 2025, despite numerous sweeps that have taken place citywide including at Ohlone Park and 8th and Harrison Streets. The items confiscated during these sweeps—tents, clothing, food, medications, mobility devices, and other essential survival gear—are critical to the health, safety, and well-being of unhoused residents.

29.     Proceeding with these encampment closures without providing reasonable accommodations and alternative housing options will cause irreparable harm to the health, safety, and civil rights of unhoused residents — both disabled and non-disabled — who depend on the stability of their current locations for survival. For many residents, these encampments are not just makeshift shelters; they are functional communities that provide proximity to food services, medical care, mutual aid and protection from violence. Displacement severs those life-sustaining connections.

30.     Over the years, unhoused have endured repeated evictions by the City of Berkeley, each one causing immense harm. These evictions have led to the loss of essential personal possessions such as RVs, trailers, cars, tents, makeshift shelters, survival gear, medical

COMPLAINT AND APPLICATION FOR TRO AND PI - 12

equipment, tools, family heirlooms and other items critical to their daily survival. This has been publicly document and is notorious. See Reporting: 'Everything Is Gone, and You Become More Lost': 12 Hours of Chaos as Berkeley Clears Encampment" *San Francisco Public Press* (December 22, 2022): https://www.sfpublicpress.org/everything-is-gone-and-you-become-more-lost-12-hours-of-chaos-as-berkeley-clears-encampment/]. During the incident described in this report, no personal property was stored by the City. Even clean, non-soiled items were thrown away.

31.     These personal belongings are often irreplaceable due to financial constraints, leaving residents even more vulnerable to the elements and unable to meet basic needs. Beyond material losses, these evictions have caused community members to be displaced further into surrounding neighborhoods, forcing them to scatter and severing the connections that provide vital support. Each time, individuals are uprooted from their networks of mutual aid, friends and loved ones, intensifying their isolation and instability.

32.     Disabled residents, in particular, suffer disproportionate harm to these types of city actions. They are not only more reliant on their possessions, such as mobility aids or medical devices, but also on the stability and support of their communities for daily survival. The repeated upheaval compounds their physical and emotional challenges, leaving them increasingly traumatized and less able to access life-sustaining resources.

33.     Representatives of the Berkeley Homeless Union have submitted dozens of ADA accommodation requests to the City of Berkely over the last several months for its members facing displacement by the City. Unfortunately, throughout the ADA interactive process, Defendant Thomas Gregory, the City's ADA Coordinator, has repeatedly failed to fulfill his legal obligations under Title II of the Americans with Disabilities Act (ADA), 28 C.F.R. §

COMPLAINT AND APPLICATION FOR TRO AND PI - 13

35.130(b)(7), which requires public entities to engage in a good-faith, two-way dialogue to explore reasonable accommodations for individuals with disabilities. Despite receiving multiple formal accommodation requests from representatives of the Berkeley Homeless Union, Gregory has persistently denied requests without conducting a case-by-case assessment of each union member and has not offered suggestions for alternative accommodations.

34.     For example, Gregory acknowledged the existence of several union members' disabilities, including ADHD, PTSD, vertigo and mobility impairments, yet demanded third-party medical verification specifically tying unhoused residents' disabilities to an inability to comply with the City's abatement order — a requirement not mandated by the ADA once a disability is already established and observable. He has not considered or proposed reasonable modifications to the city's abatement program such as extended compliance timelines, structured relocation assistance, or the designation of ADA-accessible sites where residents living in vehicles or tents can safely move. Instead, Gregory has insisted that allowing any exemption or modification would "fundamentally alter" the City's nuisance-abatement enforcement, without providing written justification or case-specific analysis to support this claim.

35.     Plaintiffs have consistently engaged in the ADA interactive process in good faith; however, their proposed accommodations have been categorically denied by the City's ADA Coordinator without meaningful consideration. The interactive process has since stalled, with the City refusing to proceed unless Plaintiffs submit individualized medical verification for each Berkeley Homeless Union (BHU) member.

36.     On February 18, 2025, BHU representative, Yesica Prado, contacted BHU members' primary healthcare provider at Lifelong Street Medicine to request the necessary documentation. She did not receive a response and later learned that the assigned nurse

COMPLAINT AND APPLICATION FOR TRO AND PI - 14

practitioner was on extended leave. As a result, obtaining medical verification has been outside of Plaintiffs' control, despite their ongoing efforts.

37. On May 7, 2025, the nurse practitioner responded to Ms. Prado's follow-up inquiry and, on May 15, confirmed that she would begin preparing the medical verification letters, with the intent to complete them before May 23. Due to these unforeseen delays, BHU members were unable to meet the self-imposed deadlines set by the City through ADA Coordinator Thomas Gregory. Plaintiffs have made diligent efforts to comply, and the resulting delays cannot reasonably be attributed to any failure on their part.

38. Gregory's conduct has had a chilling effect on the willingness and ability of disabled individuals to assert their rights under the ADA. His repeated demands for third-party professional verification—despite already acknowledging the existence of BHU members' disabilities —have imposed an unnecessary evidentiary burden that discourages unhoused individuals from requesting reasonable accommodations. These requirements not only exceed the ADA's legal standards but also create barriers for people with limited access to healthcare, mental health services, or disability documentation.  BHU members experience extreme poverty and have little to no access to primary care providers who can provide medical verification. Gregory barriers create and insurmountable barrier for many BHU members.

39. Plaintiffs and other BHU members have reported heightened anxiety, confusion, and discouragement in attempting to navigate this process. Rather than facilitating compliance or fostering accessibility, Gregory's approach has created a culture of gatekeeping that undermines the ADA's core purpose: ensuring equal access to public programs, services and protections for people with disabilities.

COMPLAINT AND APPLICATION FOR TRO AND PI - 15

40.     Gregory's conduct is also part of a broader pattern of dismissiveness in the interactive process, in which Plaintiffs and representatives of the Berkeley Homeless Union are instructed to submit "new" requests while previously submitted ones are denied without any meaningful engagement. He has refused to meet Plaintiffs and union members in person to expedite the medical verification process, lacks knowledge to answer key questions about the City's ADA policy, and redirected responsibility for ADA shelter access to the Homeless Response Team ("HRT"), while failing to confirm whether any non-congregate, ADA-compliant shelters are in fact available. Moreover, Mr. Gregory has declined to continue engaging in the interactive process unless Plaintiffs first provide medical documentation explicitly linking their disabilities to the City's enforcement actions.

41.     Defendant Thomas Gregory's refusal to participate meaningfully in the interactive process has obstructed Plaintiffs' ability to secure accommodations for themselves and members of the Berkeley Homeless Union, placing them at imminent risk of enforcement actions and further exacerbating their disabilities — while undermining their legal rights under the American with Disabilities Act ("ADA").

42.     In response, Plaintiffs bring this lawsuit to stop Defendant from displacing unhoused residents across the city—particularly Ohlone Park—until basic rights are upheld. BHU officers have repeatedly asked that Defendants Thomas Gregory, Peter Radu, Okeya Vance, Paul Buddenhagen stop evicting BHU members from public property until an interactive process can be undertaken to resolve foreseeable dangers caused by displacement and for accommodations for BHU members.

43.     However, while Plaintiffs assert their rights under the ADA and US Constitution, this case must not be reduced to a fragmented review of individual accommodation denials. The

COMPLAINT AND APPLICATION FOR TRO AND PI - 16

broader danger at issue is systemic: the City of Berkeley is engaging in a pattern of enforcement that foreseeably endangers the lives of all encampment residents—disabled and nondisabled alike—by stripping them of shelter and stability without adequate alternatives. ADA violations illustrate the City's disregard for vulnerable residents, but they do not limit the scope of constitutional harm alleged herein.

44.     Plaintiffs also seek to prevent Defendant from infringing on their constitutional rights to freedom of speech and association, as they are actively protesting the City of Berkeley's anti-homeless policies. These policies are the core issue being challenged through protest encampments, and the City's ongoing efforts to displace residents directly interfere with Plaintiffs' ability to advocate for systemic change and assert their rights.

45.     For instance, the City's practice of withholding the exact dates of planned encampment closures severely undermines Plaintiffs' ability to organize to mitigate the damages of abatements. Without advance notice, BHU and unhoused residents are unable to mobilize legal observers, media, or support networks to prevent harm, help people move and survive.

46.     As acknowledged by Peter Radu, the public posting "invites a large number of people to protest at the event, which can create safety issues in crowd control and management for everyone."

47.     This deliberate lack of transparency also creates a persistent state of fear and psychological distress, as residents are forced to live with the constant threat of sudden displacement. The uncertainty operates as a form of psychological coercion—inflicting harm even before any enforcement action takes place. When these City actions are carried out without public documentation or accountability, the harm is further compounded.

COMPLAINT AND APPLICATION FOR TRO AND PI - 17

48.    Plaintiff Berkeley Homeless Union seek an order enjoining all enforcement actions and encampment closures across the City of Berkeley that would displace unhoused individuals—including those at 8th & Harrison and Ohlone Park—until the City can demonstrate that it has identified safe, accessible alternatives and ceased practices that affirmatively endanger unhoused residents.

49. In response to the Supreme Court's ruling in *Johnson v Grants Pass* U.S. ___ 603 The City of Berkeley City Council passed RESOLUTION NO. 71,513-N.S. ("Resolution"). The Resolution's intent was to take advantage of the abrogation of protections for unhoused people formally held under *Martin*.

50.    The Resolution authorized the City Manager to abate encampments without offering alternative shelter. Holding that

"In the event the City Manager is determines that a shelter offer is not practicable, then the City Manager is nonetheless authorized to enforce state and local laws to address the following specific circumstances: (1) The fire department has determined that an encampment poses a fire hazard or emergency conditioned as referenced in the Berkeley Fire Code, BMC Chapter 19.48; or (2) The Environmental Health Division of the Health, Housing and Community Services Department has determined that the encampment poses an imminent hazard as defined in BMC section 11.36.030; or (3) The City has determined that a situation constitutes a public nuisance as defined in the BMC and is subject to abatement pursuant to the BMC; or (4)  The encampment is located on a City street median, in the roadway, or otherwise in dangerous proximity to traffic pursuant to BMC section 14.32.040 (5) The encampment is located in an area

COMPLAINT AND APPLICATION FOR TRO AND PI - 18

where the City has authorized work (such as for construction, major or minor encroachments, etc.) pursuant to BMC section 13.36.045; or (6) The encampment interferes with or impedes city or utility companies construction or maintenance activities in the public right-of-way, street lighting installation or repair, street tree maintenance, or utilities maintenance or repair.

BE IT FURTHER RESOLVED, the City Manager is authorized to take actions to deter re-encampment (after cleaning an encampment involving any of the six instances enumerated above through such means as hardscaping; signage that references state Penal Code 647(e); and/or enforcement through applicable state and local laws, even if a shelter is not practicable.

51.     Following the creation of this resolution, the City of Berkeley moved in a process of not just closing down camps — but subsequently fencing off public places that make it impossible for unhoused people to return.

52.     On January 4, 2024, Berkeley Police along with UC Berkeley shutdown the encampment at People's Park. The park provided unhoused people with easy access to water, bathrooms, food, donations of clothing, public transportation, mutual aid and protection from crime. After shutting down the encampment, massive storage containers were stacked on top of one another — permanently depriving unhoused people the ability to return and benefit from the space.

53.     Around November 22, 2024, the HRT conducted an encampment closure at 4th and Bancroft Streets. During the operation, residents' personal property was seized and destroyed. No storage receipts or documentation were issued for any of the items taken. Residents were left with only what they could carry by hand or drag across the street.

COMPLAINT AND APPLICATION FOR TRO AND PI - 19

54.      On December 14, 2024, Berkeley Police raided and shut down the encampment at Old City Hall, a centrally located encampment of two dozen people in downtown Berkeley that included many BHU members. That encampment provided BHU members with easy access to water, bathrooms, food, donations of clothing, public transportation, mutual aid and protection from crime. After it was shut down, the City of Berkeley fenced off the entire area — making it impossible for people to return.

55.      Around January 21, 2025, the City began clearing a large encampment near Cedar and Page Streets. As part of this operation, approximately 31 residents were temporarily placed in a hotel, while the remaining 30 plus residents—many of whom were members of the Berkeley Homeless Union—were displaced without alternative shelter. Following the encampment closure, the City installed signage prohibiting people from returning to the area and implemented hardscaping measures to physically prevent re-encampment.

56.      After being displaced, BHU members relocated to Martin Luther King Jr. Civic Center Park ("MLK Park") and established another encampment. This location provided essential access to water, restrooms, food, clothing donations, public transportation, and mutual aid—including protection from crime. However, in February 2025, the City of Berkeley once again abruptly shut down the encampment, forcibly displacing BHU members to a nearby park — Ohlone Park. The MLK Park was then fenced off to prevent anyone from returning.

57.      During this period, the City of Berkeley also cleared portions of the encampments along the Harrison Corridor and in the Second and Cedar area. As these sections were shut down, the City installed hardscaping—such as barriers and physical obstructions—to prevent the return of motorhomes and other forms of shelter. These areas had been critical for BHU members, offering reliable access to water, restrooms, food, clothing donations, public transportation, and

COMPLAINT AND APPLICATION FOR TRO AND PI - 20

mutual aid, including protection from crime. The City's actions effectively and permanently barred residents from returning to these essential spaces.

58. The City's strategy of closing encampments and installing hardscaping to prevent return was informed, in part, by its prior experience with the "Here There" encampment located at Martin Luther King Jr. Way and Adeline Street, which was cleared on or around September 21, 2022. That encampment had provided residents with critical access to water, restrooms, food, clothing donations, public transportation, and mutual aid—including greater safety from crime than is typically available to unhoused individuals in Berkeley. After shutting down the site, the City fenced off the area to prevent re-encampment. That fencing has remained in place ever since, effectively and permanently excluding unhoused people from using that public space.

59. Based on information and belief this pattern of closing encampments, and then using signage and hardscaping is part of a plan of the City of Berkeley, City Manager Peter Radu, Paul Buddenhagen, Okeya Vance, and Thomas Gregory is part of a plan of forcing unhoused people out of the City of Berkeley, and into more dangerous locations that are not publicly visible and lack of sanitation services, potable water, and other safety.

60. Based on information and belief, a major purpose of RESOLUTION NO. 71,513-N.S was to force unhoused people out of the areas from the downtown area—which is a place many unhoused people seek out because of its proximity to the Dorothy Day House at 1931 Center St, Berkeley, CA 94704. According to its website, the Dorothy Day House provides daily meals, packaged food, water, mail services, laundry, bathrooms, storage boxes, free clothing, internet, a place to charge electronics, respite, DMV and ID assistance, workforce training, addiction and medical referrals to partner social service agencies.

COMPLAINT AND APPLICATION FOR TRO AND PI - 21

## Standard of Review For Temporary Restraining Order

61. Under Federal Rule of Civil Procedure 65, the Court has the authority to issue a preliminary injunction. A party seeking such preliminary relief must meet one of two variants of the same standard. The traditional Winter standard requires the movant to show that (1) it "is likely to succeed on the merits;" (2) it "is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [its] favor;" and (4) "an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Under the "sliding scale" variant of the same standard, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *All. for the Wild Rockies v. Peña,* 865 F.3d 1211, 1217 (9th Cir. 2017) (emphasis in original) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.,* 709 F.3d 1281, 1291 (9th Cir. 2013)).

## Serious Questions Going To The Merits

FIRST CAUSE OF ACTION - 42 U.S.C. § 1983 14th Amendment State-Created Danger Doctrine

COMPLAINT AND APPLICATION FOR TRO AND PI - 22

62. Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

63. The Ninth Circuit recognizes a substantive due process violation under the Fourteenth Amendment where a state actor "(1) affirmatively place[s] (2) an individual in danger by acting with (3) deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006). Deliberate indifference exists where the defendant "disregard[s] a known or obvious consequence of [its] action." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).

64. Courts in the Northern District have granted preliminary injunction against encampment closures when those closures are connected to systemic policies that unconstitutionally grave risks. See *Boyd v City of San Rafael* 3:23-cv-04085 N.D. Oct 19 2023 (Granting preliminary injunction enjoining anti-camping ordinance as applied to a 40-person encampment occupied by the San Rafael Homeless Union members under the state - created danger doctrine and Americans with Disability Act). See also *Alfred v City of Vallejo 2:24-cv-03317-DC-SCR* E.D. Feb 7, 2025 (Granting preliminary injunction to halt the clearing of a disabled women's campsite after finding doing so would likely result injury, illness, and sexual violence.)

**Affirmative Act: City Will Permanently Close Ohlone Park Encampment Tomorrow May 28th**

65. On May 14th 2025 the City of Berkeley posted a "Public Notice" that was address "To: Persons encampment In Ohlone Park" "From: City of Berkeley" on the City of Berkeley's official letter head that stated they would be evicted on May 28th. **See Decl Willis ¶11 Ex A**

COMPLAINT AND APPLICATION FOR TRO AND PI - 23

66.     In addition, under Berkeley Resolution No. 71 513-N.S. gives the City Manager authority to permanently displace BHU Members from self-created communities within the City of Berkeley that provide access to self constructed shelter, food, water, hygiene facilities, mutual protection from violence and crime. The City of Berkeley subsequently uses signage and hardscaping to permanently enjoin unhoused BHU members from returning.

67.     These policies constitute affirmative acts that are causing unhoused people to be pushed into more and more dangerous living situations.

**Foreseeable Danger: City Will Permanently Close Ohlone Park Encampment Tomorrow May 28th**

68. Based on information and belief, Ohlone Park is the only park in the City of Berkeley that has water fountains and public bathrooms that is not directly next to a school, and that is a reasonable distance from the Dorothy Day House which residents rely on for daily meals, showers, and other essential services. See generally **Decl. Wootan, Decl Weaver,  Decl Gates, Decl Guyton, Decl Prado,  Decl Taylor, Decl Willis**

69. As both a policy of custom, the City of Berkeley, through City Manager Peter Radu and his designees, have created instituted a policy and custom of destroying communities of unhoused people self-created communities within the City of Berkeley that provide BHU Members access to self constructed shelter, food, water, hygiene facilities, mutual protection from violence and crime. Once these communities are destroyed, the City of Berkeley permanently closes the areas to the unhoused, as they did at Peoples Park, MLK Plaza, Old City

COMPLAINT AND APPLICATION FOR TRO AND PI - 24

Hall, and the Here-There encampments, as well as portions of the Harrison Corridor and Second and Cedar Encampments.

70.    As a direct proximate result of these actions, BHU members have been and will be further displaced from areas of relative safety to areas that are more dangerous. The encampments that have been targeted are the ones that are the largest and have the most resources, and subsequently provide the most self-constructed shelter, food, water, hygiene facilities, mutual protection from violence and crime for BHU members. Below are examples of the foreseeable dangers BHU members face.

71. BHU Members Dishwante Willis suffers from chronic pain that limits his mobility ability to walk long distances. **Willis ¶8.** He lives at Ohlone because it has enough space for his mattress, and also because it has the only public restrooms and water fountains that he is aware. **Willis ¶4¶6¶10 ¶17.** It is also near Dorothy Day House where get meals on almost a daily basis. **Willis ¶9¶17.** He has not been offered any alternative shelter and if displaced will have to move to the sidewalk to stay near bathrooms and the Dorothy Day House. ¶17

72. BHU member Jamia Wootan suffers from a hyper extended knee and can only walk a few blocks before experiencing acute pain **Decl Wootan ¶7.** She relies on the Dorothy Day House for daily meals. **id ¶6.** Ohlone Park is the only place she is aware of that has bathrooms and water fountains. **Id ¶5¶7¶8.** She is victim of stalking and relies on her campmates to deter her pursuer. **Id ¶10** She has not been offered any alternative shelter and is actively ignored by City of Berkeley's outreach workers. Id **¶15.**

73. BHU member Richard Weaver suffers from two dislocated knee caps and is confined to a wheel chair **Decl Weaver ¶2¶3¶4.** He relies on the proximity to the bathrooms and water fountains to have sanitation and drinking water because he cannot travel far for these necessities.

COMPLAINT AND APPLICATION FOR TRO AND PI - 25

It is the only place he is aware of that has bathrooms except a place up on a hill that he cannot access because of his dislocated knees *Id* ¶6. The City is not offering him an alternative – rather the City demanded he take a second floor motel room that he could not accept because he is wheel chair bound and cannot climb the stairs to his room. ¶10-11. As result, Mr. Weaver is planning on sleeping on the sidewalk or park benches, because he cannot move away from the bathrooms and water fountains. *Id* ¶12.

74. BHU members Leshwanda Gates lives at Ohlone Park and is awaiting surgery for a fungal infection to her eye -she has already lost one of corneas in her other eye because of this disease. **Decl Gates**¶4 This causes her likely to trip and fall – making walking difficult *id*. She relies on Dorothy Day House for daily meals **id ¶13.** Ohlone Park is the only place she is familiar that has water fountains and bathrooms. *Id* ¶8

75. BHU ember Trista Taylor suffers from bipolar disorder (manic depressive), obsessive compulsive tendencies, borderline schizophrenia, and borderline personality disorder.She manages these conditions by having stable places to live **Decl Taylor** ¶5. She also has chronic hip pain due to a congenital disability id ¶6 She has been attacked multiple times while living outside *id* ¶8. She also relies on Dorothy Day House for daily meals ¶10¶11. If she is forced to move, she may just have to move to the sidewalk because she can't move too faraway from Dorothy Day House on account of her hip. ¶15

76. BHU member Michael Stanley lives at Ohlone Park because it's the only place he knows he has access to a bathroom. **Decl Stanley** ¶3. It helps him be more stable and mutual aid helps him with the necessities of survival. ¶4-6. He has been displaced consecutively from other locals ¶7. He has no other place to go id ¶12

COMPLAINT AND APPLICATION FOR TRO AND PI - 26

77. Expert medical testimony demonstrates that this action is likely to result injury, illness and death for a variety foreseeable issues that arise with encampment abatements. These increased danger go on four main axes **Decl Brizzolara RN. ¶8** These include loss of access to potable water and santiation services like public toilets – which cause the spread of communicable disease. id ¶12, impairment of organs from dehydration,id ¶11 oral hygiene issues that can result in periodontal disease which cause potentially fatal conditions such as endocarditis. id ¶14 Lack of place to wash can cause accumulation of dirt and oil and bacteria that causes skin infections such as cellulitis possible progressing in to a breeding ground for flesh eating bacteria. id ¶15 These threats of repeated infection in the long term reduce the body's immune system. id ¶16

78. Additionally, forcing unhoused people with chronic pain and orthopedic injuries is likely to cause further injury and irreparable injury. Id ¶17 ¶18. Forced relocation also causes the lose of critical medical devices survival gear and rest – causing sleep deprivation and dysregulation of the body's endocrine system. Id ¶19. This can increase chronic cortisol elevations and adrenal dysfunction. Id ¶21

79. The loss of survival gear poses its own risk. Tents sleeping bags, blankets are medical necessities that unhoused people need to regulate their body temperature and accomplish restful sleep. Id. ¶21 Chronic exposure to the cold causes impairment of the bodies cardiovascular system – leading to illness and premature mortality id ¶22 . Privacy provided by the tent is also critical for restful sleep. ¶23

80. Additionally, Ms. Brizzolara identifies that Ohlone Park provides a major defense factor for unhoused women – most of whom are victims of violent or sexual attack which are generally perpetrated by strangers. Id. ¶ 27. Violence against women and unhoused people generally is

COMPLAINT AND APPLICATION FOR TRO AND PI - 27

heightened when daily routines are disrupted, placing unhoused women in strange locations with prospective assailant without capable guardian to defend them ¶27. Travelling during the day is the greatest predictor violence *id* . Encampment sweeps make women even more vulnerable, because if they are stalked at their campsites they won't call the police out of fear of the police retaliating against them by abating their camp. id ¶31. It is Ms. Brizzolara's expert opinion the Ohlone Park provides major protection against violence against women.

81. Ms. Brizzolara further identifies that abatement isolate unhoused people from medical and social services because abatements increase distrust between the unhoused. id ¶32.  She has observed the California Homeless Union work collaborative with the cities of Novato and San Rafael to create sanctioned camps. Id ¶34

82.     In short, the evidence bears out that defendant CITY OF BERKELEY will place all BHU members in to foreseeable danger as its custom. Based on the notice, **Willis ¶11 Ex** A the City will be removing BHU members from public spaces and of seizing and destroying their personal property, such as tents and other survival gear, that is necessary for their protection without providing any consideration for mitigating these foreseeable perils

83.     Without any other available option for shelter and without their vehicles, tents and survival gear—now destroyed—unhoused residents are forced to live exposed to the elements, without protection from heat, cold, wind, and rain. This severely jeopardizes their physical and mental health.

84.     Defendant CITY OF BERKELEY's actions have placed Plaintiffs and others in a more dangerous situation than the one in which they were found and created and exposed them to a danger which they would not have otherwise faced.

COMPLAINT AND APPLICATION FOR TRO AND PI - 28

85. Defendant CITY OF BERKELEY knows or should know that its actions endanger the health and safety of unhoused individuals, and defendant CITY OF BERKELEY has acted with deliberate indifference to this danger. Defendant CITY OF BERKELEY's conduct is shocking to the conscience and further imperils the health and safety of unhoused people.

86. Defendant CITY OF BERKELEY's policies and practices have and will continue to put Plaintiffs in immediate danger in violation of their substantive due process rights.

**Deliberate Indifference: City Is Aware Of Dangers But Refuses To Work With BHU To Mitigate Those Dangers**

87. The City of Berkeley is aware that Ohlone Park is the only accessible park that has bathrooms and water fountains that is within a reasonable walking distance to the Dorothy Day House – which BHU members rely upon. **Decl Prado.** The City of Berkeley has engaged in closing other parks near Dorothy Day House such as MLK Plaza, Civic Center Park, Old City Hall, and People's Park which provided comparable amentities in the last year. All of these areas are now fenced off. **Decl Prado**

88. On May 24th 2025, BHU Officer Yesica Prado sent over 6 requests for disability accommodations to defendant Thomas Gregory, the City of Berkeley's ADA Coordinator. **See Decl Prado ¶ Ex. A.**

89. Thomas Gregory, without going into an indepth fact finding, denied the requests *id*. Instead, Mr. Gregory offered a useless option – assistance "packing" but also a refusal with an assistance to "move" – even for Richard Weaver who requires use of his wheel chair. **id**

COMPLAINT AND APPLICATION FOR TRO AND PI - 29

90. This is part of a pattern of Thomas Gregory refusing to meet with BHU members and officers to find accommodations for disabilities and to mitigate the foreseeable harm of displacing BHU members there. Namely, BHU officer Yesica Prado had advised to Mr. Gregory and the City of Berkeley that the displacement cause BHU members to suffer hunger, thirst, and dehydration as a result of displacing residents from resources and networks at Eighth and Harrison, as well as psychiatric harm from social isolation and displacement, and disorientation, as well as physical harm from injury moving or being exposed to greater amounts of violence caused by the loss of mutual aid and support. **Decl Prado**

91. Thomas Gregory and the City of Berkeley are deliberately indifferent to these foreseeable harms, because they refused to meet with BHU members and officers about mitigating these foreseeable harms exacerbating these dangers and disability accommodations, because they demanded medical verification that was literally impossible to obtain because BHU members lack of available, responsive primary care providers.

92. The City of Berkeley has closed comparable parks permanently, continuously pushing BHU members farther away from daily meals, showers, and services provided by the Dorothy Day House and farther away from bathrooms and water fountains which BHU members rely on to stay hydrated

SECOND CAUSE OF ACTION – 42 U.S.C. § 12131 , Title II of the Americans With Disability Act

93. Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

94. Title II of the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in

COMPLAINT AND APPLICATION FOR TRO AND PI - 30

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination under Title II of the ADA includes administration of programs in a way that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130 (b)(3)(ii).

95.    A local government's removal of homeless individuals and their possessions from public property—as well as the provision of outreach, services, or shelter to unhoused individuals—are programs, services, and/or activities covered by Title II of the ADA. *See Boyd v City of San Rafael* 3:23-cv-04085-EMC N.D. Oct 19 2023.

96.    Failure to provide proper assistance, additional time, or other support to disabled individuals when demanding that unhoused people remove themselves or their belongings from public space is a violation of the ADA.

97.    Failing to provide shelter options to unhoused people that meet their disability needs is also a violation of the ADA because it means that shelter is functionally unavailable to them because of their disability.

98.    Defendant CITY OF BERKELEY discriminates against unhoused individuals by failing to provide adequate notice, time, and assistance to unhoused people with disabilities who are forced to move themselves or their belongings from public space in response to defendant CITY OF BERKELEY's homeless sweeps.

99.    Forcibly removing unhoused residents without first identifying and offering alternative shelter or services that meet the individualized needs of people with disabilities does not serve any sufficiently compelling or bona fide and legitimate interest of defendant CITY OF

COMPLAINT AND APPLICATION FOR TRO AND PI - 31

BERKELEY, and less discriminatory options are available to defendant CITY OF BERKELEY to achieve any interests it claims it is trying to advance.

100.    Plaintiffs BHU members have physical and mental disabilities and have been, and will be, injured by Defendant CITY OF BERKELEY's discriminatory response to unhoused residents with disabilities. Though Defendant is on notice of his disability-related needs because of prior accommodation requests he has made, he has made an additional request to this notice that has not been addressed. Members of the Berkeley Homeless Union living in the noticed area also have disabilities and have made accommodation requests that have not been addressed to date.

101.    BHU representatives, Yesica Prado and Gordon Gilmore, have submitted more than 19 disability accommodation requests to the City of Berkeley in 2025 for unhoused BHU members.

102.    In each case, the City of Berkeley delegated authority to Thomas Gregory to be a final policy decision maker and to make ADA intensive inquiries in response to these ADA requests.

103.    Yesica Prado requested in-person meetings with Mr. Gregory to engage in a fact intensive find on the disability accommodation and find solutions and accommodations to the policy of the City closing encampments under its policies for BHU members.

104.    Thomas Gregory refused to meet with BHU representatives, Yesica Prado and Gordon Gilmore, and BHU members, but rather created unreasonable barriers, in a way that did not address or find a fact intensive finding as to any ADA request.

COMPLAINT AND APPLICATION FOR TRO AND PI - 32

105.    Based on information and belief the City of Berkeley has adopted a policy, through Thomas Gregory, to frustrate and make futile, requests for disability accomodations made by BHU members through its officers.

THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 Fourth Amendment Unreasonable Search and Seizure

106.    Plaintiff reincorporates the preceding paragraphs as if fully set forth herein.

107.    The Fourth Amendment of the US Constitution states that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

108.    In *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (C.D. Cal. 2011)  the Ninth Circuit held that homeless peoples "have a legitimate expectation of privacy in their property," the district court further held that "[t]he property of the homeless is entitled to Fourth Amendment protection." Lavan also found that homeless people whose property is seized are entitled to 90 days of storage under Cal Civ Code 2080-2080.10 holding that summary destruction of momentarily unattended property needed to be stored because "California Civil Code § 2080, which requires that " any person or public entity or private entity that finds and takes possession of any ... personal property" must make a reasonable effort to return it or turn it over to the police, who must notify the owner and hold it for at least 90 days, see Cal. Civ.Code § 2080; Candid Enters. Inc. v. Grossmont Union High Sch. Dist., 39 Cal.3d 878, 885, 218 Cal.Rptr. 303, 705 P.2d 876 (1985) (" if otherwise valid local legislation conflicts with state law, it is preempted by such law and is void" ) *id.*

COMPLAINT AND APPLICATION FOR TRO AND PI - 33

109.    The City of Berkeley maintains a custom of refusing to store the property of unhoused people, and therefore destroying there property, in violation of their own stated policies that direct staff to do the opposite.

110.    According to an October 2023 presentation of Peter Radu, Assistant to the City Manager, the Homeless Response Team ("HRT") has only stored belongings on 34 occasions since the inception of the team in 2021. **(Document 1, Page 34)** In that same period of time, the HRT conducted 369 encampment closures and 444 deep cleanings. **(Document 1, Page 30.)**

111.    However, public records indicate that the actual number of storage events is even lower than what was presented to the City Council. The Department of Public Works documented only 21 instances in which it stored the property of unhoused individuals during the same period referenced in the City's presentation. Since that presentation in October 2023, the pattern has persisted — with only eight additional storage events documented through March 27, 2025, despite numerous sweeps that have taken place citywide including at Ohlone Park and 8th and Harrison Streets. The items confiscated during these sweeps—tents, clothing, food, medications, mobility devices, and other essential survival gear—are critical to the health, safety, and well-being of unhoused residents. **Decl Prado**

112.    On January 4, 2024, Berkeley Police along with UC Berkeley shutdown the encampment at People's Park. The park provided unhoused people with easy access to water, bathrooms, food, donations of clothing, public transportation, mutual aid and protection from crime. After shutting down the encampment, massive storage containers were stacked on top of one another — permanently depriving unhoused people the ability to return and benefit from the space. **Decl Prado**

COMPLAINT AND APPLICATION FOR TRO AND PI - 34

113.       Around November 22, 2024, the HRT conducted an encampment closure at 4th and Bancroft Streets. During the operation, residents' personal property was seized and destroyed. No storage receipts or documentation were issued for any of the items taken. Residents were left with only what they could carry by hand or drag across the street. **Decl Prado**

## Irreparable Harm

114.    The Ninth Circuit has held that "[a]n alleged constitutional infringement will often alone constitute irreparable harm." *Associated Gen. Contractors of Cal., Inc. v. Coal. of Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991)

115.    When evaluating irreparable harm as applied to encampment abatements, courts in the Ninth Circuit generally evaluate the constitutional infringement and likelihood of physical harm. *See Alfred v City of Vallejo* 2:24-cv-03317-DC-SCR E.D. Feb 7 2025 *"*Plaintiff has established there are serious questions as to the merits of her Fourteenth Amendment claim that Defendant City's clearing of her shelter would violate her substantive due process rights under the state-created danger doctrine. In addition, Plaintiff alleges serious risk of harm if Defendant City removes her shelter because she has no alternative place to stay and cannot carry survival gear due to her disabilities. (citation) These harms include, but are not limited to, an increased risk of exposure to the elements, especially during the winter season, aggravation of her disabilities which limit mobility, risk of physical injury, exposure to sexual violence, and "a credible fear [from] previously [being] victimized." See *Boyd*, 2023

COMPLAINT AND APPLICATION FOR TRO AND PI - 35

WL 6960368, at *13 (finding plaintiffs made a showing of irreparable harm where they faced psychological harm from isolation, exacerbated drug use, enhanced risk of drug overdose, and exposure to sexual and domestic violence from the "imposition of isolated camping by unhoused persons as prescribed by [a] [o]rdinance"); *Alfred* * 19-20

116.    BHU Members Dishwante Willis suffers from chronic pain that limits his mobility ability to walk long distances. **Willis ¶8.** He lives at Ohlone because it has enough space for his matress, and also because it has the only public restrooms and water fountains that he is aware. **Willis ¶4¶6¶10 ¶17.** It is also near Dorothy Day House where get meals on almost a daily basis. **Willis ¶9**¶17. He has not been offered any alternative shelter and if displaced will have to move to the sidewalk to stay near bathrooms and the Dorothy Day House. ¶17

117.    BHU member Jamia Wootan suffers from a hyper extended knee and can only walk a few blocks before experiencing acute pain **Decl Wootan ¶7.** She relies on the Dorothy Day House for daily meals. **id ¶6.** Ohlone Park is the only place she is aware of that has bathrooms and water fountains. **Id ¶5¶7¶8.** She is victim of stalking and relies on her campmates to deter her pursuer. **Id ¶10** She has not been offered any alternative shelter and is actively ignored by City of Berkeley's outreach workers. Id **¶15.**

118.    BHU member Richard Weaver suffers from two dislocated knee caps and is confined to a wheel chair **Decl Weaver** ¶2¶3¶4. He relies on the proximity to the bathrooms and water fountains to have sanitation and drinking water because he cannot travel far for these necessities. It is the only place he is aware of that has bathrooms except a place up on a hill that he cannot access because of his dislocated knees *Id* ¶6. The City is not offering him an alternative – rather the City demanded he take a second floor motel room that he could not accept because he is wheel chair bound and cannot climb the stairs to his room. ¶10-11. As

COMPLAINT AND APPLICATION FOR TRO AND PI - 36

result, Mr. Weaver is planning on sleeping on the sidewalk or park benches, because he cannot move away from the bathrooms and water fountains. *Id* ¶12.

119.   BHU members Leshwanda Gates lives at Ohlone Park and is awaiting surgery for a fungal infection to her eye -she has already  lost one of corneas in her other eye because of this disease. **Decl Gates**¶4 This causes her likely to trip and fall – making walking difficult *id*. She relies on Dorothy Day House for daily meals **id ¶13.** Ohlone Park is the only place she is familiar that has water fountains and bathrooms. *Id* ¶8

120.   BHU member Trista Taylor suffers from bipolar disorder (manic depressive), obsessive compulsive tendencies, borderline schizophrenia, and borderline personality disorder.She manages these conditions by having stable places to live **Decl Taylor** ¶5. She also has chronic hip pain due to a congenital disability id ¶6 She has been attacked multiple times while living outside *id ¶8*. She also relies on Dorothy Day House for daily meals ¶10¶11. If she is forced to move, she may just have to move to the sidewalk because she can't move too faraway from Dorothy Day House on account of her hip. ¶15

121.   BHU member Michael Stanley lives at Ohlone Park because it's the only place he knows he has access to a bathroom. **Decl Stanley** ¶3. It helps him be more stable and mutual aid helps him with the necessities of survival. ¶4-6. He has been displaced consecutively from other locals ¶7. He has no other place to go id ¶12

122.   Expert medical testimony demonstrates that this action is likely to result injury, illness and death for a variety foreseeable issues that arise with encampment abatements. These increased danger go on four main axes **Decl Brizzolara RN. ¶8** These include loss of access to potable water and santiation services like public toilets – which cause the spread of communicable disease. id ¶12, impairment of organs from dehydration,id ¶11 oral hygiene issues

COMPLAINT AND APPLICATION FOR TRO AND PI - 37

that can result in periodontal disease which cause potentially fatal conditions such as endocarditis. id ¶14 Lack of place to wash can cause accumulation of dirt and oil and bacteria that causes skin infections such as cellulitis possible progressing in to a breeding ground for flesh eating bacteria. id ¶15 These threats of repeated infection in the long term reduce the bodies immune system. id ¶16

123.    Additionally, forcing unhoused people with chronic pain and orthopedic injuries is likely to cause further injury and irreparable injury. Id ¶17 ¶18. Forced relocation also causes the lose of critical medical devices survival gear and rest – causing sleep deprivation dysregulation of the body's endocrine system. Id ¶19. This can increase chronic cortisol elevations and adrenal dysfunction. Id ¶21

124.    The loss of survival gear poses its own risk. Tents sleeping bags, blankets are medical necessities that unhoused people need to regulate their body temperature and accomplish restful sleep. Id. ¶21 Chronic exposure to the cold causes impairment of the bodies cardiovascular system – leading to illness and premature mortality id ¶22 . Privacy provided by the tent is also critical for restful sleep. ¶23

125.    Additionally, Ms. Brizzolara identifies that Ohlone Park provides a major defense factor for unhoused women – most of whom are victims of violent or sexual attack which are generally perpetrated by strangers. Id. ¶ 27. Violence against women and unhoused people generally is heightened when daily routines are disrupted, placing unhoused women in strange locations with prospective assailant without capable guardian to defend them ¶27. Travelling during the day is the greatest predictor violence id . Encampment sweeps make women even more vulnerable, because if they are stalked at their campsites they wont call the police out of

COMPLAINT AND APPLICATION FOR TRO AND PI - 38

fear of the police retaliating against them by abating their camp . id ¶31. It is Ms. Brizzolara's expert opinion the Ohlone Park provides major protection against violence against women.

126.    Ms. Brizzolara further identifies that abatement isolate unhoused people from medical and social services because abatements increase distrust between the unhoused. id ¶32. She has observed the California Homeless Union work collaborative with the cities of Novato and San Rafael to create sanctioned camps. Id ¶34

## Balance of Equities and Public Interest

127.    "The purpose of preliminary injunctive relief is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined." *Heflebower v. U.S. Bank Nat. Ass'n*, No. 1:13-cv-1121-LJO-MJS, 2013 WL 3864214, at *18 (E.D. Cal. July 23, 2013) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "A court balancing the equities will look to possible harm that could befall either party." Jeremiah, 2018 WL 1367541, *5 (citing CytoSport, Inc. v. Vital Pharm., Inc., 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009) aff'd, 348 F. App'x 288 (9th Cir. 2009)). "*Alfred v City of Vallejo* 2:24-cv-03317-DC-SCR E.D. Feb 7 2025

128.    When evaluating the balance of equities and public interest in litigation around encampment, courts frequently look at how injunctions can be narrowly tailored to address health and safety needs of the unhoused, as well as legitimate police powers of cities.

129.    Firstly, Courts have taken the position that the health and welfare of unhoused people is of significant public interest see *Alfred v City of Vallejo* 2:24-cv-03317-DC-SCR E.D. Feb 7 2025 "The court finds that at this juncture, Defendant City has not shown there are

COMPLAINT AND APPLICATION FOR TRO AND PI - 39

weighty public safety, health, and welfare concerns that expeditious removal of Plaintiff's shelter will serve."

130.    Additionally where there is evidence that an encampment presents a public burden, courts will narrowly tailor injunction that allow the City exercise legitimate police powers in a way that does not cause a state-created danger. *See Boyd v City of San Rafael* 3:23-cv-04085-EMC N.D. Oct 19 "[T]he Court concludes that full enforcement of the Ordinance is likely to inflict irreparable harm upon the Plaintiffs and threatens to impinge upon certain legal rights. On the other hand, maintaining a blanket injunction and leaving the encampment in place would impose significant hardships upon the City and threaten its valid interest in safeguarding public health and safety. The Court will lift the broad temporary restraining order and issue a narrowly tailored preliminary injunction which permits enforcement of the Ordinance under limited conditions, conditions which accommodate the competing interests of both parties while minimizing their respective hardships"

131.    Here, the balance of equities and public interest tip sharply in Plaintiffs' favor and there are ample opportunity for a narrow injunction that accommodates the competing interests of the parties. Firstly, Plaintiffs have been living at Ohlone Park for months. **See Declarations Generally.** If people are displaced – they are not going to disappear – only move onto nearby sidewalks that are likely cause a greater impact on the public. **See Declarations Generally.**

132.    The hardships the City face and the needs of unhoused people can be balanced by tailoring the injunction to minimize the respective hardships – such as how the court in *Boyd* permitted a limited implementation of the ordinance. For example, the City of Berkeley could allow BHU members to move to a particular part of the park that is reasonably close to the bathrooms and water fountains to accommodate their disabilities. Obviously Mr. Weaver who is in a wheel chair,

COMPLAINT AND APPLICATION FOR TRO AND PI - 40

needs to be fairly close to a restroom. This is true for other BHU members. The parties could be ordered to meet

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  The court issue a TRO and PI enjoining the closure of Ohlone Park and eviction of BHU members and other homeless campers therein.

B.  The court issue a TRO and PI enjoining the destruction of property belonging to BHU members and other homeless campers in Ohlone Park without due process of law.

C.  The Court issue a permanent injunction enjoining the City of Berkeley from imposing state-created dangers upon unhoused people within the City of Berkeley through its encampment abatement program.

D.  Order defendant CITY OF BERKELEY to pay for Plaintiffs' attorneys' fees and costs; and

E.  Grant Plaintiffs such further relief as the Court deems just and proper.


Dated: May 27, 2025

Respectfully submitted,
/s/ Anthony Prince
Anthony D. Prince,
Law Offices of Anthony D. Prince

Attorneys for Plaintiff
Berkeley Homeless Union

COMPLAINT AND APPLICATION FOR TRO AND PI - 41

**VERIFICATION**

I, Yesica Prado, am a founder and official representative of the Berkeley Homeless Union. I have read the foregoing complaint and know the contents therein to be true and correct. The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: May 27, 2025                                    /s/ Yesica Prado

COMPLAINT AND APPLICATION FOR TRO AND PI - 42