1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    BERKELEY HOMELESS UNION,              Case No. 25-cv-04449-HSG

8                  Plaintiff,              **ORDER DENYING APPLICATION
                                           FOR PRELIMINARY INJUNCTION**
9           v.                             **AND REQUEST FOR MAGISTRATE
                                           JUDGE SETTLEMENT CONFERENCE**
10   CITY OF BERKELEY, et al.,
                                           Re: Dkt. Nos. 2, 16
11                 Defendants.

12

13          Before the Court is Plaintiff Berkeley Homeless Union's (BHU) request for a preliminary

14   restraining order seeking to halt Defendant City of Berkeley's planned closure of an encampment

15   at Ohlone Park.  Dkt. No. 2.  The Court **DENIES** the motion.

16   I.     **BACKGROUND**

17          On May 27, 2025, Plaintiff initially filed an ex parte application for a temporary

18   restraining order (TRO) and preliminary injunction seeking to halt the closure of Ohlone Park

19   encampment, which was scheduled to begin as soon as May 28, 2025.  *See* Dkt. No. 2-5, Ex. A,

20   at 6.  The complaint and application name as Defendants City of Berkeley ("the City") and City

21   employees Paul Buddenhagen, Thomas Gregory, Peter Radu, Okeya Vance, and Does 1-10.  *See*

22   Dkt. No. 2 ("PI") ¶¶ 6–9.  Plaintiff seeks relief on behalf of its members who are disabled and

23   non-disabled unhoused individuals currently living in Ohlone Park.  *See* PI ¶¶ 10, 20.  The request

24   for preliminary injunction asks the Court to enjoin "the closure of Ohlone Park and eviction of

25   BHU members and other homeless campers therein," and to enjoin "the destruction of property

26   belonging to BHU members and other homeless campers in Ohlone Park without due process of

27   law."  *See id.* at 41, §§ A–B.

28          The Court denied Plaintiff's TRO request, finding that Plaintiff had not shown serious

United States District Court
Northern District of California

1    questions going to the merits of any of its claims sufficient to warrant extraordinary emergency

2    relief without notice to Defendants and an opportunity to respond. *See* Dkt. No. 8 ("Order") at 2.

3    The Court further ordered Defendants to respond to Plaintiff's motion and set a hearing on the

4    preliminary injunction motion. *Id.* at 5. The parties then stipulated to extend the briefing

5    deadlines and continue the hearing. Dkt. No. 12 at 2–3. Defendants also agreed not to clear the

6    encampment until the Court rules on the motion for preliminary injunction. *Id.* at 3. Defendants

7    filed their opposition to Plaintiff's motion, and Plaintiff filed a reply. *See* Dkt. Nos. 13 ("Opp."),

8    14 ("Reply"). The Court heard oral argument on June 5, 2025, and took the motion for

9    preliminary injunction under submission. *See* Dkt. No. 15.

10    On June 9, 2025, Plaintiff filed an administrative motion asking the Court to order the

11    parties to attend a mandatory settlement conference with a magistrate judge. *See* Dkt. No. 16.

12    Defendants oppose the motion. *See* Dkt. No. 17.

13    **II.    DISCUSSION**

14    The standard for issuing a temporary restraining order and issuing a preliminary injunction

15    are substantially identical. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d

16    832, 839, n.7 (9th Cir. 2001). Such an order may be issued only where the plaintiff has

17    established: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to

18    plaintiff in the absence of preliminary relief; (3) the balance of equities tips in plaintiff's favor;

19    and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*,

20    555 U.S. 7, 22 (2008). Under the Ninth Circuit's sliding scale approach, a plaintiff may

21    alternatively establish that there are "serious questions going to the merits" if "a hardship balance

22    [also] tips sharply towards the plaintiff," and the other two *Winter* factors are satisfied. *See All.*

23    *for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

24    Plaintiff's complaint alleges violations of the Americans with Disabilities Act (ADA), the

25    Fourteenth Amendment's state-created danger doctrine, and the Fourth Amendment's prohibition

26    against unreasonable searches and seizures. *See* PI ¶¶ 62–113.

27    //

28    //

2

United States District Court
Northern District of California

A.     **Likelihood of Success on the Merits**[1]

The Court previously held that Plaintiff failed to raise serious questions going to the merits of any of its claims sufficient to warrant a TRO without notice. *See* Order at 5. The Court now evaluates the merits of Plaintiff's claims in the context of its request for a preliminary injunction and the expanded record.

i.     **ADA**

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II's implementing regulations, in turn, require state agencies to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). As such, "[t]he ADA requires 'only 'reasonable modifications' that would not fundamentally alter the nature of the service provided.'" *Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852, 862 (9th Cir. 2022) (citing *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)). "In no event is the entity required to undertake measures that would impose an undue financial or administrative burden or effect a fundamental alteration in the nature of the service. . . [.] Public entities are not required to create new programs that provide heretofore unprovided services to assist disabled persons." *See Where Do We Go Berkeley*, 32 F.4th at 862 (internal citations and quotation marks omitted).

As described in the Court's prior order, Plaintiff's complaint and application for preliminary relief generally alleges that the City "discriminates against unhoused individuals by

---

[1] Defendants first argue that Plaintiff lacks either organizational or associational standing to bring its claims. *See* Opp. at 13–15. However, as explained below, the Court finds that Plaintiff has not shown that it is likely to succeed on, or raised serious questions going to, the merits of any claims. Consequently, the Court declines to address Defendants' standing arguments for purposes of deciding Plaintiff's request for preliminary injunction. The Court thus does not make any affirmative findings or conclusions regarding Plaintiff's standing to bring its claims. Defendants may raise their arguments challenging standing at a later stage in the litigation.

United States District Court
Northern District of California

failing to provide adequate notice, time, and assistance to unhoused people with disabilities who are forced to move themselves or their belongings from public space." *See* PI ¶ 98. The City posted a notice of abatement at Ohlone Park on May 14, 2025, alerting inhabitants that the encampment closure could begin as soon as May 28, 2025. *See* Dkt. No. 2-5, Ex. A, at 6. Plaintiff alleges that Yesenia Prado, BHU representative, submitted seven requests for disability accommodations to Defendant on Saturday, May 24, 2025, *see* Dkt. 2-9 ("Prado Decl.") ¶ 11, and that in response, the City's ADA Program Coordinator, Thomas Gregory, "created unreasonable barriers," and "without going into an in depth fact finding, denied the requests." *See* PI ¶¶ 89, 103. None of the declarations of BHU members provided by Plaintiff mention or describe any accommodation requests, and Plaintiff submitted its exchange with Mr. Gregory regarding only one request made on behalf of Mr. Richard Weaver.[2] *See* Prado Decl., Ex. A. In that exchange, initiated in an email sent at 4:00 p.m. on the afternoon of the 24th, Ms. Prado requested the following accommodations for Mr. Weaver: 1) an ADA-accessible, ground-floor, non-congregate hotel room; 2) a hotel stay exceeding 28 days; 3) permission to remain at Ohlone Park "until a legally adequate and physically accessible shelter or housing option is secured"; 4) assistance with transporting Mr. Weaver's belongings if and when he is relocated from the park; 5) waiver of the City's requirement that Plaintiff provide third-party verification from a qualified professional regarding the nexus between Mr. Weaver's disabilities and his inability to comply with the City's order to vacate the encampment; and 6) that the City pause any enforcement action against Mr. Weaver until the interactive process is completed. *See id.* at 2.

Defendant Gregory responded to the request two days later, on the Memorial Day holiday. *See* Prado Decl., Ex. A, at 3. Mr. Gregory stated that he had a prior conversation with Mr. Weaver at Ohlone Park on May 15, 2025, in which Mr. Weaver did not make an accommodation request and rejected Defendant's offer of packing assistance. *Id.* Mr. Gregory did not accede to Ms. Prado's request to waive the City's request for medical verification of Mr. Weaver's disabilities.

---

[2] The Court's prior order previously referred to Mr. Weaver as "Mr. Weaber" based on Ms. Prado's declaration and exhibits referring to him this way. The Court will now refer to him as "Mr. Weaver" based on his declaration, *see* Dkt. No. 2-6, and Plaintiff's reply referring to him as "Mr. Weaver."

*Id.* He also stated that the requests for shelter, physical relocation, and transportation services fell outside the scope of reasonable accommodations. *Id.* Plaintiff then responded on the evening of May 26, 2025, again requesting that Defendant waive the medical verification requirement and asking that Defendant provide assistance identifying ADA-accessible shelter options. *Id.* at 5.

In opposition, Defendants provided evidence of Mr. Gregory's exchanges with Ms. Prado regarding accommodation requests made on behalf of the three BHU members whose declarations were submitted in this case: Mr. Weaver, Lushawndia Gates, and Jemia Wootan. *See* Dkt. No. 13-2 ("Gregory Decl.") ¶ 11. Regarding Mr. Weaver's request, Defendants' evidence shows an additional response by Mr. Gregory explaining that he was requesting verification of Mr. Weaver's disability in part because Mr. Weaver did not request an accommodation during his conversation with Mr. Gregory at the park. *See id.*, Ex. B, at 14. Mr. Gregory also offered to extend Mr. Weaver's compliance deadline to June 4, 2025, and reiterated the offer to assist him with packing (not moving). *Id.* at 14–15.

The other two exchanges reflect similar requests from Plaintiff and responses from Mr. Gregory. On behalf of Ms. Gates, Ms. Prado requested access to non-congregate shelter, a stable location where Ms. Gates can remain while she has surgery, and assistance with navigating paperwork in order to obtain a housing voucher. *See* Gregory Decl., Ex. A, at 11–12. Ms. Prado also asked that Ms. Gates be permitted to remain in the park until the interactive process is completed. *Id.* at 12. In response, Mr. Gregory asked for professional verification of Ms. Gates's disability. *Id.* at 10. He clarified that access to shelter is not a reasonable accommodation, but that Ms. Gates could contact the City's Homeless Resource Term for information about shelters, and in turn request a reasonable accommodation if shelter was offered. *Id.* He also explained that the City does not provide assistance with applying for housing vouchers, and shared information about a local organization that could offer such support. *Id.*

Finally, Ms. Prado made similar requests on Ms. Wooten's behalf, asking for placement in a private-non-congregate shelter or hotel room; permission to remain with her emotional support dogs; "step-by-step relocation assistance"; an extended timeline for compliance with the abatement order; a mental health provider or case manager; and mobility assistance or

1    transportation support to a new shelter cite, medical appointments, or city meetings.  *See* Gregory

2    Decl., Ex. C., at 26–27.  Again, Mr. Gregory responded by asking for third party medical

3    verification, and clarified that access to shelter is not a reasonable accommodation, but referred

4    Ms. Wooten to other City staff for information about shelter options.  *Id.* at 24.  He also provided

5    information about the City's mental health services, and stated that the City does not provide

6    physical relocation or transportation services, but could offer packing support.  *Id.* at 25.  Ms.

7    Prado responded, reiterating several of the previous requests, and adding a request for Ms. Wooten

8    to remain in place in Ohlone Park until an ADA-compliant shelter for her is identified.  *Id.* at 23.

9        In denying Plaintiff's ex parte TRO request, the Court held that Plaintiff failed to explain

10   how Defendants' response as demonstrated in Mr. Gregory's exchange with Ms. Prado regarding

11   Mr. Weaver supported a finding of serious questions going to the merits of Plaintiff's ADA claim.

12   The Court reaches the same conclusion based on the expanded preliminary injunction record.

13       First, Plaintiff still fails to raise serious questions as to whether any of the declined

14   requests made on behalf of members are reasonable accommodations under the ADA such that

15   Defendants violated the law by denying them.  In opposition, Defendants argue that Plaintiff's

16   requests to stay in the park are not reasonable accommodations because they would fundamentally

17   alter the nature of the government program at issue here, which is Defendants' enforcement of the

18   City of Berkeley's abatement order to establish compliance with City regulations prohibiting

19   camping in parks.  *See* Opp. at 19; *see also McGary v. City of Portland*, 386 F.3d 1259, 1269 (9th

20   Cir. 2004) ("[C]ompliance with municipal code enforcement can constitute a benefit of the

21   services, programs, or activities of a public entity under Title II.").  Specifically, Defendants

22   contend that allowing individuals to continue living in the park would fundamentally alter the

23   purpose of the City's abatement activity by essentially turning the park into residential land.  *See*

24   Opp. at 19.  To support this argument, Defendants cite the Ninth Circuit's decision in *Where Do*

25   *We Go Berkeley*, which held that the plaintiffs' request to delay by six months Caltrans's clearing

26   of an encampment would amount to a fundamental alteration because it would require Caltrans to

27   create a new program to provide people with housing solutions.  *See* 32 F.4th at 862 ("The district

28   court effectively asked Caltrans to house Plaintiffs on its property until Plaintiffs found new

1   housing, with no regard to the safety risks that make clearing level 1 encampments so critical.  But

2   Caltrans does not provide people with housing solutions and cannot make clearing level 1

3   encampments dependent on when the people living there can relocate.").  Here, Defendants argue

4   that Plaintiff's requests for access to shelter, assistance with housing applications, and physical

5   relocation or transportation assistance are not reasonable accommodations because the City does

6   not already provide such services, and as such, the ADA does not require it to create them.  *See*

7   Opp. at 19.

8           The Court previously held that Plaintiff's preliminary injunction motion (which is the same

9   as its TRO motion) did not explain how the ADA requires Defendants to grant any of the declined

10  requests, and its showing on reply and at oral argument did not cure this deficiency.  Plaintiff's

11  reply entirely fails to make any additional legal arguments to support its ADA claim, or to rebut

12  any of Defendants' arguments.  *See* Reply at 6 (arguing only that Plaintiff "has in fact raised

13  serious questions going to the merits of its underlying claim of violations of the 14th Amendment

14  right to substantive due process").  At the hearing, Plaintiff's counsel repeated the argument that

15  the ADA requires Defendants to allow disabled individuals to stay in the park until the City can

16  provide them shelter or housing that they deem adequate.  *See also* PI ¶ 24 (alleging that

17  "enforcing displacement and abatement policies while failing to provide even minimally sufficient

18  or accessible shelter alternatives" is "in direct violation of the ADA").  But counsel did not cite

19  any legal authority supporting his position when the Court asked for it.

20          Counsel also attempted to distinguish *Where Do We Go Berkeley* on the basis that the

21  proposed alternative Caltrans property at issue in that case was itself dangerous to encampment

22  members.  But here, Defendants also argue that the Ohlone Park encampment poses health and

23  safety risks to park inhabitants due to an ongoing construction project in the park, *see* Dkt. No.

24  13-1 ("Ferris Decl.") ¶¶ 6–8, and based on crime and other safety issues that increased over the

25  last several months as the encampment has grown, *see* Dkt. No. 13-3 ("McGee Decl.") ¶¶ 6–7.  It

26  is true that, unlike Caltrans, the City of Berkeley does have other programs that connect unhoused

27  individuals to shelter services, lease hotel rooms, and create permanent housing.  *See* Opp. at 5.

28  However, those are different programs than the abatement program at issue here.  And the Court

United States District Court
Northern District of California

does not understand Plaintiff's ADA claim to allege that individuals who have been offered shelter or housing as part of those other programs have been denied reasonable accommodations in the provision of such services. *See Prado v. City of Berkeley*, No. 23-CV-04537-EMC, 2024 WL 3697037, at *26 (N.D. Cal. Aug. 6, 2024) (holding that plaintiff who was living in a tent and not currently in shelter did not having standing to bring claim alleging that City's offers of shelter violated the ADA).[3]

In addition, Plaintiff also fails to raise serious questions as to whether the City failed to fulfill its obligation to engage in the interactive process. The record (including contemporaneous emails) directly contradicts Plaintiff's claim that Mr. Gregory refused to meet with individuals camping at Ohlone Park and failed to conduct any individual fact-finding as to their ADA requests. *See* PI ¶ 104. According to Mr. Gregory's declaration, he visited Ohlone Park the day after the encampment closure notice was posted "and attempted to speak with as many campers as possible." *See* Gregory Decl. ¶ 8. He indicated that he asked any individuals he encountered whether they had "any disability-related reason why [they] would be unable to leave the park on [their] own on May 28th." *Id.* ¶ 7. On his first visit, he spoke with six people, including Mr. Weaver, and none of them requested a reasonable accommodation. *Id.* ¶ 8. He visited the next day and spoke with a few others, including Ms. Gates, who also did not make any reasonable accommodation requests. *Id.* ¶ 9. He made one final visit on May 21, 2025, and encountered only one additional person, who similarly reported that they did not have a disability. *Id.* ¶ 10. Mr.

---

[3] At the hearing, Plaintiff's counsel also cited *Alfred v. City of Vallejo*, No. 2:24-CV-03317-DC-SCR, 2024 WL 4922022 (E.D. Cal. Nov. 29, 2024), to suggest that the court in that case had granted the same ADA-related relief sought here. To start with, *Alfred* is not binding on this Court. Further, the *Alfred* court did not consider any accommodation requests by plaintiff to stay in her encampment permanently, indefinitely, or until the city provided housing. Instead, the court found that plaintiff's TRO motion raised serious questions going to merits of her ADA claim by showing that the city had failed to connect her with support services to locate accessible housing "as promised," and entirely failed to respond to her updated accommodation request. *See Alfred*, 2024 WL 4922022, at *3. Here, by contrast, Plaintiff challenges Defendants' denial of ADA requests, rather than any failure to respond to them or to provide an accommodation that was granted. Moreover, the *Alfred* court later found that plaintiff's preliminary injunction motion failed to raise serious questions as to her ADA claim because the city had since engaged in the interactive process and granted her requests for assistance with packing and moving. *See Alfred v. City of Vallejo*, No. 2:24-CV-03317-DC-SCR, 2025 WL 435900, at *8 (E.D. Cal. Feb. 7, 2025), *appeal filed*, No. 25-1658 (9th Cir. March 13, 2025).

Gregory did not receive any further communication from individuals living at Ohlone Park until May 24, 2025, when he received the seven reasonable accommodation requests from Ms. Prado. *Id.* ¶ 11. He responded to all of these requests over the holiday weekend. *Id.* ¶ 13. And as discussed above, regarding the three declarants in this case who submitted accommodation requests, his exchanges with Ms. Prado evidence his good faith engagement in the interactive process: he responded to each request sought, explained his reasoning for denying any requests, offered accommodations such as extending compliance dates or providing packing support, and identified City and external resources for accessing shelter or other support services.[4] Finally, Plaintiff still fails to provide any legal support for the argument that Defendant's request for third-party medical verification violated the ADA. *See* Order at 4.

In sum, the Court finds that Plaintiff's showing is still too conclusory and unsupported by record evidence to raise serious questions going to the merits of its ADA claim.

### ii.    Fourth Amendment

A city must comply with the requirements of the Fourth Amendment when seizing property that has been abandoned by unhoused individuals. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012). This means providing such individuals with sufficient notice and an opportunity to be heard before seizing and destroying their property. *See id.*

The notice of the encampment closure posted at Ohlone Park on May 14, 2025, informed those camped in the park of the City of Berkeley's policy regarding abandoned property. *See* Dkt. No. 2-5, Ex. A, at 6. The notice lists items that the City will not store, such as soiled or perishable items, furniture, broken items, weapons, or other hazardous items. *Id.* at 6–7. It also lists the personal property that may be stored up to 90 days, such as identification documents, tents, sleeping bags, luggage, backpacks, medication, and eyewear. *Id.* at 7. Finally, it explains how individuals can contact the City or visit in person to reclaim their property. *Id.*

Here, Plaintiff does not appear to argue that the Defendants' encampment property policy

---

[4] At the hearing, Plaintiff's counsel stated that the declarations it submitted contradicted Defendants' evidence regarding the ADA requests. However, counsel did not explain how, Plaintiff's reply does not make this assertion, and any contradictions are not evident to the Court based on the record.

United States District Court
Northern District of California

is facially unconstitutional, but rather that the City violates the law by failing to follow its stated commitment to store certain types of property left at encampments.  *See* PI ¶ 109. ("The City of Berkeley maintains a custom of refusing to store the property of unhoused people, and therefore destroying [their] property, in violation of their own stated policies that direct staff to do the opposite.").  Plaintiff alleges that this is evident because Defendants, in an October 2023 presentation, did not report an instance of storing property corresponding with each encampment closure that occurred during the same period.  *See id.* ¶¶ 110–111; *see also id.* ¶ 113 (alleging that in November 2024 at a different encampment in Berkeley, Defendants seized property and "[n]o storage receipts or documentation were issued for any of the items taken").

The Court agrees with Defendants that Plaintiff's Fourth Amendment claim is speculative and does not raise serious questions going to the merits.  It is not reasonable to infer that the City "maintains a custom" of failing to comply with its storage policy based solely on the allegation that Defendants have not reported a storage event or provided a storage receipt for each encampment closure that has taken place in Berkeley.  *See Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 987 (N.D. Cal. 2019) ("The whole point of providing homeless residents with notice is to give them an opportunity to remove their belongings and avoid its collection and storage by the City.  [A lack of storage receipts] could very well demonstrate the effectiveness of the notices rather than the City's failure to store property.").  Plaintiff also fails to allege any facts specific to its members living in Ohlone Park and the City's treatment of their property.  *Cf. Prado*, 2024 WL 3697037, at *14 (allowing Fourth Amendment claim to proceed where plaintiffs had specifically alleged past incidents in which the City had failed to store plaintiffs' belongings or to provide an opportunity to reclaim them before they were destroyed).  Accordingly, Plaintiff's request for a preliminary injunction based on its Fourth Amendment theory also fails.

### iii.    State-Created Danger

"To make use of the state-created danger exception, a plaintiff must satisfy two requirements, both of which relate to the defendant-officer's conduct.  First, the plaintiff must establish that the officer's affirmative conduct exposed the plaintiff to a foreseeable danger that she would not otherwise have faced.  Second, the plaintiff must show that the officer acted with

deliberate indifference to a known or obvious danger." *Est. of Soakai v. Abdelaziz*, 137 F.4th 969, 982 (9th Cir. 2025) (internal citations and quotation marks omitted).

Here, Defendants argue that Plaintiff's state-created danger claim fails because Plaintiff: 1) does not allege any particularized danger; 2) fails to allege that closing the encampment would expose its members to any danger that is not inherent in being unhoused; and 3) has not shown that Defendants would be acting with deliberate indifference. *See* Opp. at 22–24. Defendants have also offered evidence that remaining in the park exposes, and will expose, Plaintiff's members to various dangers, including violence, crime, and safety hazards due to impending construction at the park. *See* Ferris Decl. ¶¶ 6–8; McGee Decl. ¶¶ 6–7.

On reply, Plaintiff does not respond directly to any of Defendants' arguments or evidence, or cite any case law to supplement its initial showing that the Court previously rejected as too conclusory. Instead, Plaintiff repeats its allegation that Ohlone Park "is the only park in the City of Berkeley that has water fountains and public bathrooms that is not directly next to a school, and that is a reasonable distance from the Dorothy Day House which residents rely on for daily meals, showers, and other essential services." *See* Reply at 6–7. Plaintiff argues that these facts establish that closing the encampment "with no safe, alternative place [for its members] to go" will have the "direct consequence of separating them from vital life-preserving support" and will "aggravate and exacerbate existing disabilities." *See id.* at 7.

The Court previously held that Plaintiff's ex parte TRO request failed to raise serious questions going to the merits of its state-created danger claim because Plaintiff did not explain why requiring individuals to leave Ohlone Park, even if doing so would move them further from certain resources, rises to the level of a state-created danger. *See* Order at 5. As with Plaintiff's other claims, the Court now reviews Plaintiff's state-created danger claim in the context of its request for a preliminary injunction and the expanded record. In light of Plaintiff's failure to address Defendants' evidence or counterarguments, or to apply any controlling law to the facts here, the Court finds that Plaintiff cannot meet its burden to establish that it is likely to succeed on the merits of its claim. As such, the Court evaluates whether Plaintiff has at least met the "serious questions" standard.

### a. Affirmative Conduct

Beginning with the "affirmative conduct" prong of the state-created danger test, Plaintiff must establish that Defendants' "affirmative actions (1) placed [Plaintiff's members] in a worse position than they would have occupied had Defendants not acted at all; (2) created or exposed [Plaintiff's members] to an actual and particularized danger; and (3) resulted in foreseeable harm to [Plaintiff's members]." *Soakai*, 137 F.4th at 983.

As to the second element, Defendants argue that Plaintiff has not shown a particularized danger because the claim that closing the park will endanger inhabitants by forcing them to relocate further from sanitation, food, and other resources is "generic to anyone present in any encampment." *See* Opp. at 22. The Court disagrees. "Affirmative state action that exposes a broad swath of the public to 'generalized dangers' cannot support a state-created-danger claim." *Polanco v. Diaz*, 76 F.4th 918, 927 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2519 (2024) (quoting *Sinclair v. City of Seattle*, 61 F.4th 674, 676, 683 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 88 (2023)). However, "a danger can be 'particularized' even if it is directed toward a group rather than an individual," as long as the group is "'discrete and identifiable.'" *See Polanco*, 76 F.4th at 927 (quoting *Sinclair*, 61 F.4th at 676). And here, Plaintiff alleges and submits facts supporting its claim that Defendants' action to close the Ohlone Park encampment is directed at, and will therefore impact, the discrete, identifiable group of individuals who currently live in the park. *See Polanco*, 76 F.4th at 927 (holding that transfer of inmates between two California state prisons during the COVID-19 pandemic was a sufficiently particularized danger "because the transfer exposed a 'discrete and identifiable group'—prison guards and inmates at San Quentin—to the dangers of COVID-19"). *Cf. Sinclair*, 61 F.4th at 683 (holding that City of Seattle's failure to address lawlessness and crime occurring in the Capitol Hill Occupied Protection ("CHOP") zone was not particularized as to plaintiff's son because the City did not direct any actions towards him, but rather created a "generalized danger" in the CHOP zone that was experienced by all members of the public who chose to visit it). Defendants' argument that Plaintiff fails to show a particularized danger simply because other unhoused individuals could encounter harms that are similar to those alleged here if evicted from their encampments is unpersuasive.

1    But whether Plaintiff has raised serious questions going to the merits of the other two

2    elements of the affirmative conduct prong is a closer question.  First, Plaintiff must show that

3    closing the encampment will place its unhoused individuals in a worse position than they would be

4    in if Defendants did not do so.  *See Soakai*, 137 F.4th at 983.  More specifically, Plaintiff must

5    show that closing the encampment will "increase[] the level of danger" faced by the individuals

6    living in Ohlone Park "above the counterfactual baseline level of danger that would have existed

7    without [Defendants'] intervention."  *Id.* at 984 (internal citation and quotation marks omitted).

8    When municipalities have failed to provide reasonable notice of encampment closures,

9    courts in this district have issued limited orders temporarily delaying the closures for short periods

10    in order to provide unhoused individuals sufficient notice and adequate time to relocate, but then

11    dissolved those orders and denied preliminary injunction requests seeking further delay.  *See Blain*

12    *v. California Dep't of Transportation*, 616 F. Supp. 3d 952, 957, 958 (N.D. Cal. 2022) (finding

13    that Caltrans's "imminent removal of the plaintiffs, when done without sufficient warning or plans

14    for shelter, would expose them to unjustifiable dangers they otherwise would not face", and

15    issuing TRO explicitly "for a period long enough to give them adequate notice of the action");

16    *Blain v. California Dep't of Transportation*, No. 3:22-CV-04178-WHO, 2022 WL 3702106, at *7

17    (N.D. Cal. Aug. 26, 2022) (dissolving TRO and denying preliminary injunction after closure had

18    been delayed for approximately one month, even though defendant "was not providing each

19    individual with shelter"); *Tassey v. California Dep't of Transportation (Caltrans)*, No. 23-CV-

20    05041-AMO, 2023 WL 6466205, at *3 (N.D. Cal. Oct. 4, 2023) (granting TRO request by

21    unhoused plaintiff given only one business day's notice of encampment closure "only for the

22    length of time needed for him to relocate"); *Tassey v. California Dep't of Transportation*, No. 23-

23    CV-05041-AMO, 2023 WL 7003258, at *3 (N.D. Cal. Oct. 24, 2023) (dissolving TRO and

24    denying request for preliminary injunction because harm had been mitigated given that plaintiff

25    "had two weeks—the exact amount of time he asked for and said he would need—to relocate").

26    Other district courts in this circuit have issued preliminary injunction orders delaying

27    encampment closures on the basis of the state-created danger doctrine.  Plaintiff cites some of

28    these cases in its brief, and Plaintiff's counsel mentioned some of them at the hearing.  *See* PI

United States District Court
Northern District of California

¶ 64.  For example, one court found that a ban on day camping in Sausalito during the peak of the COVID-19 pandemic, which "[flew] in the face of CDC guidance" regarding the transmission of the disease among unhoused populations, would increase danger to unhoused individuals by creating a specific health and safety risk.  *See Sausalito/Marin Cnty. Chapter of California Homeless Union v. City of Sausalito*, 522 F. Supp. 3d 648, 659 (N.D. Cal. 2021), *modified in part sub nom. Sausalito/Marin Cnty. Chapter of California Homeless Union v. City of Sausalito*, No. 21-CV-01143-EMC, 2021 WL 2141323 (N.D. Cal. May 26, 2021).  In another case, the same judge found that the City of San Rafael's ordinance imposing certain density requirements on camping would force unhoused individuals to suffer dangers associated with camping in isolation. *See Boyd v. City of San Rafael*, No. 23-CV-04085-EMC, 2023 WL 6960368, at *22 (N.D. Cal. Oct. 19, 2023), *opinion clarified*, No. 23-CV-04085-EMC (EMC), 2023 WL 7283885 (N.D. Cal. Nov. 2, 2023).  And in *Alfred*, the court found that removing a plaintiff's shelter built out of tarps and construction materials during the winter season was likely to expose her to the elements, especially given that there was "no dispute" in the record that the particular plaintiff had "no alternative shelter, housing, or camping option."  *See Alfred*, 2025 WL 435900, at *9.

In addition to the threshold fact that none of these cases are binding on this Court, some of them addressed markedly different circumstances than the kind of straightforward encampment closure that is being challenged here.  In *Alfred* and *Sausalito*, the closures were set to take place in unique conditions—the pandemic and the winter season—that threatened specific asserted dangers, and the courts found sufficient evidence of the "immediate" and "obvious" harms that the unhoused individuals were likely to encounter if the challenged government action went forward. *See, e.g.*, *City of Sausalito*, 522 F. Supp. 3d at 660 (in issuing injunction, noting that "as the COVID-19 situation changes, the preliminary injunction may need to be revisited" as "[t]he calculation of safety risks and the balance of hardships could change if the pandemic recedes").[5]

---

[5] *Boyd* addressed a state-created danger theory alleging facts that are more similar to those alleged here, but it also involved a challenge to a substantially different type of city ordinance.  *See Boyd*, 2023 WL 6960368, at *21 (finding that camping density ban would expose unhoused individuals to risks of camping in isolation).

United States District Court
Northern District of California

United States District Court
Northern District of California

1        In this case and on this motion, the Court finds that the evidence Plaintiff has submitted of

2   the "immediate" dangers threatening unhoused people if they are evicted from Ohlone Park is

3   inherently speculative given the broad state-created danger theory that Plaintiff alleges, and the

4   broad relief it seeks based on that theory.  At bottom, Plaintiff's argument is that, as a general

5   matter, living as an unhoused person outside of Ohlone Park is more dangerous than living as an

6   unhoused person at the unauthorized encampment inside the park.  The preliminary injunction

7   motion asserts that "[a]s both a policy [and] custom, the City of Berkeley . . . [has] created [and]

8   instituted a policy and custom of destroying communities of unhoused people [and] self-created

9   communities within the City of Berkeley that provide BHU Members access to self constructed

10  shelter, food, water, hygiene facilities, mutual protection from violence and crime," and that "[a]s

11  a direct [and] proximate result of these actions, BHU members have been and will be further

12  displaced from areas of relative safety to areas that are more dangerous."  *See* PI ¶¶ 69–70.

13  Similarly, as to Ohlone Park specifically, Plaintiff argues there is "no safe, alternative place to go"

14  outside the park for all of its members and anyone else camping there because they will be

15  "separate[ed] from vital life-preserving support."  *See* Reply at 7.

16        Based on this claim, Plaintiff seeks to "enjoin[] the closure of Ohlone Park and eviction of

17  BHU members and other homeless campers therein."  *See* PI at 41, § A.  Plaintiff does not ask for

18  more notice than the two weeks that the City provided, or make any other specific limited requests

19  to mitigate the alleged threat of harm.  Instead, it essentially requests a blanket order blocking the

20  City's enforcement of its abatement policy that on its face would apply even beyond Plaintiff's

21  members, and without any limitations on its duration or scope.[6]  Although the preliminary

22  injunction motion claims that there is "ample opportunity for a narrow injunction," the only

23  potential narrowing Plaintiff offers in the motion is that the City "could allow BHU members to

24  move to a particular part of the park that is reasonably close to the bathrooms and water fountains

25  to accommodate their disabilities."  *See id.* at 131–132.  But this relief would not be meaningfully

26  _____

27  [6] The Court notes that the permanent relief Plaintiff seeks based on its state-created danger theory
    is even broader and more generalized: it asks the Court to "issue a permanent injunction enjoining

28  the City of Berkeley from imposing state-created dangers upon unhoused people within the City of
    Berkeley through its encampment abatement program."  *See* PI at 41, § C.

1    different than indefinitely barring the closure of the encampment.  Moreover, at the hearing,

2    Plaintiff's counsel argued that the Constitution requires the City to delay closing the encampment

3    until it has sufficiently addressed the housing needs of each person living in the park (or at least

4    put them "on track" for housing).

5         Yet Plaintiff fails to cite any controlling authority for the proposition that substantive due

6    process requires (or authorizes) the Court to order such broad relief.  In addition, Plaintiff has only

7    provided specific evidence of the asserted danger threatened by the encampment closure as to a

8    small subset of individuals.  And finally, Plaintiff fails to address Defendants' evidence showing

9    that encampment members suffer other dangers by living there.  *See* Opp. at 23–24.  Given that the

10   record is disputed, Plaintiff has presented limited evidence of likely harm given the exceptional

11   breath of its theory and requested relief, and Plaintiff has offered only conclusory legal argument

12   to support its theory, determining whether Plaintiff's members will experience a level of danger

13   living outside the encampment that is "above the counterfactual baseline level of danger" that they

14   would encounter in remaining at the encampment is a subtle exercise at best, not "obvious" as the

15   doctrine requires.  *See Soakai*, 137 F.4th at 981, 983.

16        The foreseeability of the harm alleged is difficult to evaluate for similar reasons.  Based on

17   the evidence offered by Plaintiff about the dangers unhoused individuals face due to encampment

18   sweeps generally, the Court recognizes that those who are forced to leave the encampment *may*

19   experience different threats of violence, and *may* face increased difficulty accessing certain

20   resources such as bathrooms and drinking water.  *See generally* Dkt. No. 2-2 ("Brizzolara Decl.").

21   But the Court does not find that this general information provides sufficient evidence about the

22   "known and obvious" dangers posed by the closure of this specific encampment to justify

23   imposing the extraordinarily broad preliminary relief Plaintiff seeks here.

24        Whether living in an encampment in a public park in Berkeley is meaningfully safer than

25   living elsewhere is a difficult assessment, especially for the courts.  And the Ninth Circuit has not

26   directly addressed the applicability of the state-created danger doctrine to these circumstances.

27   *See Roe v. City and Cnty. of San Francisco*, No. 24-CV-01562-JST, 2024 WL 4505475, at *3

28   (N.D. Cal. Oct. 15, 2024) (explaining that "[t]he Ninth Circuit has applied the state-created danger

United States District Court
Northern District of California

16

doctrine only in serious cases of assault, shootings and death"). That said, viewing the overall record and applying the "serious questions" standard, the Court concludes that Plaintiff has not met its burden to raise serious questions as to whether the closing of the Ohlone Park encampment will expose Plaintiff's members to a foreseeable danger that they otherwise would not have faced. Although the serious questions standard is less demanding than the one articulated in *Winter*, the Ninth Circuit has clarified that "it does not erase the Supreme Court's admonition that an injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 497 (9th Cir. 2023) (quoting *Winter*, 555 U.S. at 22). "Accordingly, a 'serious question' does not exist where the plaintiff's claim is 'merely plausible' or just because there are legal questions not directly answered by past precedent." *See Petrick*, 68 F.4th at 497. In this case, Plaintiff's argument that closing the encampment will foreseeably place all those camping in the park in a worse condition might be plausible for Rule 12(b) pleading purposes. But Plaintiff's arguments are too conclusory, and the evidence presented is too speculative, to make a "clear showing" of a serious question as to whether closing the encampment will violate the Constitution by creating an obvious and foreseeable danger to everyone currently living there so as to justify the extraordinary remedy of a preliminary injunction delaying the closure indefinitely.

### b. Deliberate Indifference

The Court also finds that Plaintiff has failed to raise serious questions as to the merits of the deliberate indifference prong of the state-created danger test. "Deliberate indifference remains a stringent standard of fault, requiring a culpable mental state. Not even gross negligence will do." *Soakai*, 137 F.4th at 985 (internal citations and quotation marks omitted). Further, Plaintiff "must show that Defendants knew that their intentional actions would expose [Plaintiff's members] to an unreasonable risk." *Id.* at 984. In other words, Plaintiff must show that Defendants "knew that something was going to happen, but ignored the risk and exposed [Plaintiff's members] to it anyway." *See id.*

Here, Plaintiff argues that the City of Berkeley is deliberately indifferent to the risks posed by closing Ohlone Park because Defendants "refused to meet with BHU members and officers

about mitigating these foreseeable harms exacerbating these dangers and disability accommodations" and "demanded medical verification that was literally impossible to obtain." *See* PI ¶ 91.  But as discussed above, the record directly contradicts this claim.  Mr. Gregory confirms under oath, with substantial corroboration from contemporaneous documents, that he visited members of the park, offered information about disability accommodations to the individuals he encountered, and made a facially good-faith effort to engage in the interactive process.  *See* Gregory Decl. ¶¶ 8–13.  And again, Plaintiff provides no authority to support its contention that the City may not lawfully request medical verification to support a reasonable accommodation request.  Moreover, the City's mitigation efforts, and the countervailing legitimate interest that it has in enforcing laws barring illegal encampments and preserving park property for the public's use and enjoyment, undermine the notion that the risk of harm posed to the park's inhabitants is unreasonable.  *See* Opp. at 27.

In short, the Court finds that the record shows that the City has not ignored the harms that Plaintiff's members may face if the Ohlone Park encampment is closed, but instead recognized and took steps addressed to mitigating those harms, while maintaining its ultimate authority to enforce the law.  *Cf. Alfred*, 2025 WL 435900, at *10 (finding that "the record before the court [did] not demonstrate that Defendant City [had] made a good faith effort to connect [p]laintiff with housing resources" as it had previously promised plaintiff and the court it would do).  Significantly, Defendants provided two weeks' notice, extended that deadline an additional week as to Mr. Weaver at his request, and agreed not to proceed with clearing the encampment until this motion is decided (effectively providing several more weeks of notice to park inhabitants).  Plaintiff has thus failed to offer facts showing any official conduct by Defendants that "shocks the conscience" as required to raise serious questions regarding its state-created danger claim under the clear showing standard.  *See Sinclair*, 61 F.4th at 680 (internal citation and quotation marks omitted).

### B.    Balance of the Equities

Even if Plaintiff had raised serious questions going to the merits of its state-related danger claim, the Court could only grant preliminary relief if Plaintiff also establishes that "a hardship

balance tips sharply towards" it, and that the other two *Winter* factors are satisfied. *See Cottrell*, 632 F.3d 1127, 1134–35.

The Court finds that even if Plaintiff had met the serious questions threshold, the balance of hardships does not tip sharply towards Plaintiff such that it is entitled to the relief it seeks. Defendants have submitted substantial and persuasive evidence that allowing the encampment to persist in Ohlone Park harms the public in several ways, including by curtailing the public's use and enjoyment of the park, impacting public safety in the surrounding neighborhood, and impeding the City's infrastructure improvements. *See* Opp. at 27–28; Ferris Decl. ¶ 4 (describing that City park staff have been directed not to use Ohlone Park for summer camp activities based on reports of harassment, theft, assault, and open drug use in the park); *id.* ¶¶ 6–7 (describing that part of the encampment is obstructing an active construction area in the park, and that a construction worker was assaulted and tools were stolen); *id.* ¶ 7 (stating that construction crews will be excavating areas of the park that may create hazards for encampment residents); McGee Decl. ¶ 6 (reporting that Berkeley Police Department has received an increasing number of calls for service related to Ohlone Park since March 2025 as the encampment has grown); *id.* ¶¶ 9–28 (describing numerous documented incidents related to the encampment of "physical and verbal altercations, stalking, assault, brandishing weapons, and drug possession, demonstrating a pattern of instability and unsafe conditions at the park"); *id.* ¶¶ 29–30 (describing that at a town hall, many residents reported that they "feel unsafe being in or around the park due to open drug use and repeated incidents involving aggressive or threatening behavior by encampment residents"). Granting the relief Plaintiff seeks—an injunction that, in practice, indefinitely blocks the City from closing the encampment until it meets conditions that Plaintiff and its members would determine—would require the Court to disregard this substantial hardship. *See Boyd*, 2023 WL 6960368, at *16 (holding that enjoining "enforcement in toto" of the City's encampment ordinance was not warranted "in view of the substantial concerns of the City with the current encampment").

As mentioned, Plaintiff maintains that the injunction it seeks is "narrow." *See* PI ¶ 131; Reply at 3 (stating that injunction sought "only requires that City of Berkeley not be deliberately

United States District Court
Northern District of California

United States District Court
Northern District of California

1    indifferent to the sanitation needs of BHU members.").  But this characterization plainly does not

2    align with the indisputably broad relief Plaintiff actually seeks, in the form of an order "enjoining

3    the closure of Ohlone Park" without any time restrictions or other limitations.  *See* PI at 41, § A.

4    At oral argument, Plaintiff's counsel similarly claimed that Plaintiff does not seek an order that

5    would allow the encampment to remain indefinitely, referencing settlements that other homeless

6    unions have reached with cities in which the parties eventually settled on mutually agreeable

7    solutions to address the encampment issues and the individual needs of the encampment

8    inhabitants, such as housing them in other city-owned property, procuring Section 8 vouchers or

9    access to other housing services for them, or moving them to a "more appropriate" public park.

10    However, as the Court pointed out at the hearing, those are examples of policy compromises

11    negotiated by the parties, not court-ordered relief sanctioned by the Constitution.  And again,

12    when pressed to identify what the Constitution does require here if not an indefinite order

13    prohibiting the encampment from being closed, Plaintiff's counsel argued that the Constitution

14    requires the City to delay closing the encampment until it has sufficiently addressed the housing

15    needs of each person living in the park (without citing any controlling authority for this

16    proposition).  In sum, Plaintiff fails to propose any narrowly tailored injunction that might more

17    appropriately balance the harms between the parties.

18           Plaintiff ultimately argues that the Constitution forbids the City of Berkeley from clearing

19    this (and logically, any other similar encampments) unless and until it provides specified forms of

20    shelter to everyone there, or makes an alternative piece of public property available for a

21    sanctioned encampment.  Based on the Court's review of the briefs and its own research, this

22    position has never been adopted by the Supreme Court or the Ninth Circuit, and at a minimum it is

23    in tension with holdings from those courts in cases addressing similar questions in the

24    encampment removal context.  *See City of Grants Pass v. Johnson*, 603 U.S. 520, 554–55 (2024)

25    (reversing ruling that the Eighth Amendment prohibited certain encampment removals, and

26    holding that "[b]y imbuing the availability of shelter with constitutional significance in this way,

27    many cities tell us, *Martin* and its progeny have 'paralyzed' communities and prevented them

28    from implementing even policies designed to help the homeless while remaining sensitive to the

1  limits of their resources and the needs of other citizens"); *Where Do We Go Berkeley*, 32 F.4th

2  at 864 ("The district court cannot require Caltrans to allow the campers to live on another Caltrans

3  property because such an order goes beyond preserving the status quo. . . .  This would be no

4  different from the district court requiring Caltrans to move the campers into a hotel or other

5  housing.").

6         Plainly, elected officials in Berkeley and many other cities face very difficult policy

7  decisions about how to balance the needs of the unhoused population, the interests of the

8  community more broadly, and the reality that budgets are limited in the face of many worthy

9  competing priorities.  There simply are no easy answers to this complex and persistent challenge.

10  *See Grants Pass*, 603 U.S. at 560 ("Homelessness is complex.  Its causes are many.  So may be

11  the public policy responses required to address it.").  The Court is not blind to the very difficult

12  circumstances facing Plaintiff's members, in Ohlone Park and elsewhere.  And it does not

13  begrudge Plaintiff's zealous legal and policy advocacy on behalf of its members.  But the risk in

14  adopting its expansive position is that it effectively constitutionalizes the most basic aspects of

15  policymaking with respect to housing, homelessness and city governance, displacing the role of

16  elected officials in favor of routine judicial oversight of the granular details of encampment

17  management.  It also fosters an accompanying expectation of routine, or even ubiquitous, court-

18  ordered delay of policymakers' efforts to strike the right balance in managing these exceedingly

19  difficult challenges.  That position should not be adopted lightly, as the Supreme Court explained

20  in rejecting the analogous constitutional theory in *Grants Pass*.  *See id.* at 560 ("Nor can a handful

21  of federal judges begin to match the collective wisdom the American people possess in deciding

22  how best to handle a pressing social question like homelessness.  The Constitution's Eighth

23  Amendment serves many important functions, but it does not authorize federal judges to wrest

24  those rights and responsibilities from the American people and in their place dictate this Nation's

25  homeless policy.") (citation and internal quotation marks omitted).  Further, contrary to counsel's

26  seeming invitation at oral argument, lawsuits and court orders are not simply another leverage

27  mechanism to encourage (or even force) the City to adopt Plaintiff's preferred policy outcomes.

28         All of this is to say that in the Court's view, Plaintiff's boundary-pushing version of the

United States District Court
Northern District of California

21

state-created danger doctrine goes well beyond any application yet endorsed by the Supreme Court or the Ninth Circuit (or any other court of appeals, to the Court's knowledge). *See Sacramento Homeless Union v. City of Sacramento*, 115 F.4th 1149, 1154-1155 (9th Cir. 2024) (Nelson, J., dissenting from denial of rehearing en banc) (explaining that "a constitutional violation occurs only when the state uses its monopoly on physical force to coerce an individual's actions," finding that "[t]he lawful clearing of encampments does not rise to that level of constitutional deprivation," and recommending that "in future cases, district courts in our circuit should reorient their decisions in this area to a more faithful reading of the original meaning of the Fourteenth Amendment").

### III.    CONCLUSION

Plaintiff has not met its burden of raising serious questions going to the merits of any of its claims, or establishing that the balance of hardships tips sharply in its favor such that it is entitled to the extraordinary relief it requests. The Court therefore **DENIES** Plaintiff's request for preliminary injunction, Dkt. No. 2. Should the City choose to renew its efforts to remove campers from Ohlone Park, it must provide a new compliant notice to vacate at least 72 hours in advance of any removal action, and otherwise comply with all of its policies and procedures.

In addition, the Court **DENIES** Plaintiff's request for a mandatory settlement conference before a magistrate judge, Dkt. No. 16. The motion fails to comply with Local Rule 7-11, which requires that any motion for administrative relief be accompanied "by either a stipulation under Civil L.R. 7-12 or by a declaration that explains why a stipulation could not be obtained." *See* Civ. L.R. 7-11(a). Plaintiff has not submitted either document, and there is no indication that Plaintiff attempted to obtain a stipulation from Defendants or even discussed this motion with them before filing it. *See* Dkt. No. 17 at 16.

Finally, the Court **SETS** a case management conference on July 8, 2025, at 2:00 p.m. The hearing will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio

capabilities.  The parties are further **DIRECTED** to file a joint case management statement by July 3, 2025.

      **IT IS SO ORDERED.**

Dated: June 25, 2025

HAYWOOD S. GILLIAM, JR.
United States District Judge